OGDEN CITY, a Municipal Corporation, Appellant, v. THE BEAR LAKE & RIVER WATERWORKS & IRRIGATION COMPANY, a Corporation, THE BEAR RIVER IRRIGATION & OGDEN WATERWORKS COMPANY, a Corporation, SAMUEL M. JARVIS and ROLAND R. CONKLIN, Respondents.

### No. 1501.　(76 Pac. 1069.)

1. **Municipal Corporations: Contract for Water Supply: Validity.**

   Sess. Laws 1888, p. 116, c. 48, art. 4, sec. 1, subd. 14, provided that a city council should have power, among other things, to construct and maintain waterworks, or to authorize the construction and maintenance of the same by others. *Held*, that a contract between a city and defendant for the construction and maintenance of a system of waterworks by defendant was valid, though made by a resolution, and not by an ordinance.

2. **Same: Estoppel.**

   Where a city contracted with defendant for the building of a waterworks system, by which defendant was to supply the city and its inhabitants with water, and it permitted the construction of the waterworks, and for more than six years availed itself of the benefits of the system, and assessed and collected an annual tax thereon, and permitted a third person to acquire title to the system, the city was estopped to thereafter question the validity of the contract.

3. **Same: Consideration.**

   A city waterworks system being in an almost worthless condition, the city contracted with another to lease to him the city's water right, in consideration of the benefits and advantages to be secured to the city, for an annual rental of $1; and thereafter the city, under the contract, received a satisfactory water service, and free water for the purpose of flushing sewers, etc.　*Held*, that the contract was not void on the theory that a part of the consideration was the leasing by the city of its water right, which had been dedicated to a public use, for an annual rental of $1; the true consideration being the construction of a new water system, and the furnishing of a plentiful supply of water.

**4.  Same:  Power to Lease.**
Where the waterworks system of a city was in such a condition that it was almost worthless, the city had authority to lease its water right to another in consideration of his erecting and maintaining a waterworks system for the furnishing of a proper supply of water to the city.

**5.  Same: Confiscation of Property: Constitutional Law.**
Where, by contract between a city and another, the latter agreed to build and maintain a waterworks system for supplying water to the city, and such party, relying on the terms of the contract and the good faith of the city, constructed, at a cost of many thousands of dollars, a satisfactory water system, a decree holding the contract void because of any informality in its execution, and that the city was the owner of the waterworks system, and was entitled to the rents which had been collected, would have amounted to a violation of Const. art. 1, section 22, declaring that personal property shall not be taken for public use without just compensation.

(Decided May 28, 1904.)

Appeal from the Second District Court, Weber County. —*Hon. H. H. Rolapp*, Judge.

The facts are stated by the court. From a judgment in favor of the defendants, the plaintiff appealed.

AFFIRMED.

*John E. Bagley, Esq.*, and *John D. Murphy, Esq.*, for appellant.

Neither the city nor the taxpayers are estopped from contesting the validity of the proceedings if they act within a reasonable time. 2 Beach, Pub. Cor., sec. 1327; State v. Atlantic City, 9 Atl. 759; 15 A. & E. Enc. of Law, 1100; Seeger v. Mueller, 24 N. E. 515. Estoppel does not apply to the illegal acts of municipal corporations or acts done in violation of law. 1 Beach 217.

Municipal corporations can only be bound by con-

tracts authorized by ordinance duly passed. Borough of Milford v. Milford Water Co., 17 Atl. 186, 124 Pa. St. 610; 2 Beach on P. C., sec. 1328; Newman v. City of Emporia, 32 Kan. 456, 4 Pac. 818; Hunt v. Lambertville, 45 N. J. Law 281; State v. Bayonne, 6 Vroom 335; State v. Hoboken, 6 Vroom 205; 17 A. and E. Enc. of Law, 237, 238; McCoy v. Bryant, 53 Cal. 249, 251; Town of Durango v. Pennington, 8 Colo. 257, 7 Pac. 15; Pettis v. Johnson, 56 Ind. 136; City of Central v. Sears, 2 Colo. 589; Smith v. Com., etc., 41 Pa. St. 335.

And contracts not so authorized are not ratified by payments for water made by councils not interested in the company. 2 Beach on P. C., sec. 1328; Borough of Milford v. Milford Water Co., 17 Atl. 186, 124 Pa. St. 610; Town of Durango v. Pennington, 6 Colo. 257, 7 Pac. 15; San Diego Water Co. v. City of San Diego, 59 Cal. 592; McBrien v. Grand Rapids, 56 Mich. 95.

Not only the courts, but individuals, are bound to know the law, and cannot be received to plead ignorance of it. The holder of the bonds in question can claim no indulgence on that score, and can take no advantage from the allegation that he is a bona fide purchaser without notice. South Ottawa v. Perkins, 94 U. S. 260; Boone on Corp., sec. 104; Weisner v. Village of Douglass, 64 N. Y. 91; McPherson v. Foster, 43 Iowa 48; Seeger v. Mueller et al., (Ill.) 24 N. E. 515.

Where council can only act, originally, by ordinance, it can only ratify by ordinance. Cross v. Morristown, 18 N. J. Eq. 305; 15 A. and E. Enc. of Law, p. 1104; 1 Beach on Pub. Corp., sec 251 and n.; McCracken v. San Francisco, 16 Cal. 519; Pimental v. San Francisco, 21 Cal. 351; Town of Durango v. Pennington, 8 Colo. 257, 7 Pac. 15, 17; Brown v. Mayor, etc., of N. Y., 63 N. Y. 239; People v. Swift, 31 Cal. 26; New Orleans v. Clark, 95 U. S. 644; McCoy v. Bryant, 53 Cal. 249, 251.

The reference to the "contract" and the subsequent resolution to authorize the mayor to execute the engrossed copy did not validate it. South Ottawa v.

Perkins, 94 U. S. 260; McCracken v. San Francisco, 16 Cal. 619.

The contract to lease the water or lease itself (if such it was) was beyond the scope of the authority of the city and was therefore void *ab initio*, and could not afterwards be given life. 1 Beach on P. C., 248 and n. 3; San Diego Water Co. v. City of San Diego, 59 Cal. 521, 522.

All persons are bound to take notice of the powers and authority which the law confers upon the city and its officers, and are chargeable therewith. 1 Dillon on Mun. Corp., p. 518 and n., 530 and notes; Lewis v. City of Shreeveport, 208 U. S. 202; 15 Am. and Eng. Enc. of Law, p. 1100; 2 S. C. 634; Parr v. Prest, etc., of Green Bush, 72 N. Y. 472; Seeger v. Mueller et al., (Ill.) 24 N. E. 515; McCoy v. Bryant, 52 Cal. 249, 251; 68 N. Y. 23; 1 Beach Pub. Corp., sec. 252, 253, and notes.

*Andrew Howat, Esq.,* and *E. B. Critchlow, Esq.,* for respondents.

Counsel for appellant cite authorities which they claim support their contention that the contract was not legally adopted by the city council, because it was adopted by resolution and not by ordinance. We think that the authorities are uniform that where the business on hand is not of a legislative nature, but pertains to the making of a contract relating to the business of the municipality and the statute does not in express terms require the adoption of the contract to be by ordinance, it may be by resolution. Our statute does not require that the business matters of this nature shall be adopted by ordinance, and therefore the general rule that a resolution is a proper and sufficient manner of adopting a contract applies. This very question was raised by Ogden City in the case of Weaver v. Ogden City, and the Circuit Court of the United States for the District of Utah held that the statutes of Utah did not require the contract to be adopted by ordinance and that the contract was properly and legally adopted by resolution.

On appeal to the Circuit Court of Appeals, that court affirmed the judgment of the court below and held that the contract was properly and legally adopted by resolution. Ogden City v. Weaver, 108 Fed. 564, and cases cited.

Furnishing water by a city to its inhabitants is neither a governmental function nor a municipal duty. Western etc. Society v. Philadelphia, 31 Pa. St. 175, 183; Girard Life Ins. Co. v. Philadelphia, 88 Pa. St. 393, 394; Bailey v. City, etc. (Pa.), 39 At. 494; Wagner v. City of Rock Island, 146 Ill. 139, 153; People ex rel. v. Common Council, 15 Am. 208, 209.

A municipal corporation can exercise the following powers: 1st. Those granted in express words; 2nd. Those necessarily or fairly implied in or incident to the powers expressly granted. 1 Dillon, Mun. Cor., sec. 89.

We think the power of the city to grant a lease of the supply of water that had been used by it to furnish its water to its inhabitants, to one with whom it contracts to furnish its water to its inhabitants, fairly inferable from the power to make such a contract. Los Angeles v. City, 88 Fed. 720, 729; Sutherland on Statutory Construction, secs. 334-341; Mayor v. Sands, 105 N. Y. 210, 218; Brown v. Graham, 58 Tex. 254; People v. Briggs, 50 N. Y. 553; Odell v. De Witt, 53 N. Y. 643.

### STATEMENT OF FACTS.

The evidence in this case, and in which there appears to be no material conflict, shows about the following facts:

In the year 1880 a corporation known as the Ogden Water Company constructed and put in Ogden City a small system of waterworks for the purpose of furnishing said city, and the inhabitants thereof, with water. In 1882 Ogden City purchased an interest in the waterworks referred to, and in 1884 acquired title to the entire system. The total amount paid by the city, including the amount they had previously paid the water company in assessments, was $74,000. The system, which

had already proved wholly inadequate to supply the needs of the city, was extended from year to year to the extent warranted by the limited revenue of the city, but the extensions did not keep pace with the natural growth of the city, and could not supply the increased demands made on the system for water. In the winter the supply of water was obtained from what are known as Strong's and Waterfall Canons, but in the summer the city made no claim to water from this source, as certain farmers had a prior and superior right thereto, so that the supply of water during the summer months was taken from Ogden river, which source of supply was also rendered somewhat uncertain in times of scarcity because of the rights of farmers who owned interests in the waters of this stream. These conflicting interests caused more or less confusion, and the city's supply was reduced at times when most needed because of having to divide with the farmers. In the winter the source of supply from Ogden river had to be abandoned, because, there being no dam in the river, the intake pipe would fill with mush ice from the river and become clogged. Therefore Ogden City had no single source from which to draw for the whole year the limited amount of water necessary to supply its system of waterworks.

In 1889—the year in which the transactions occurred which gave rise to this litigation—the supply of water was insufficient to meet the necessities and demands of the inhabitants for water. The pipes for distribution did not reach nearly all the people who desired to be supplied with water from the waterworks system, and the city did not have the means with which to make the necessary and much-needed extensions of its pipe lines. Many of the people had to resort to the use of wells, the water of which was inferior in quality to, and not so healthy as, the mountain water supplied through the waterworks system. The amount of water furnished through the old system was about .98 of a cubic foot per second. The water was first run into a reser-

voir having a capacity of from 220,500 to 250,000 gallons, and was located so low down in the city that it could not supply many of the residents with water, and gave a very inefficient service to those connected with the system. In the business part of the city the normal pressure of the water was barely sufficient to force it to the second floor of the buildings, and was entirely inadequate to be of any service in case of fire.

Mr. Cheney, who was the superintendent of the waterworks in 1889, was called as a witness, and testified in behalf of the city, in part, as follows: "The average pressure while I was working in the department was about forty-five pounds to the square inch, taking it the year around. . . . This is not a good fire pressure. It is no pressure at all. When there was a fire we did the best thing we could until we got the steamer to work. . . . When a fire occurred, we simply shut a portion of the water off. I would locate whatever fire hydrants they were taking water from for the fire. Then . . . I would concentrate the pressure to that particular hydrant. I would shut down the lawn sprinkling and house sewers, and everything like that. If a man happened to be in the district while the water was shut off, he could not take a drink of water when the fire was going on." And again he says: "The average pressure on Adams avenue in the thickly-settled portion of the city, in the summer time, would run from ten to twenty pounds. . . . Outside of the hydrant limit there was no protection [from fire] at all. Inside the hydrant limit there was some protection."

In fact, the evidence both for plaintiff and defendants shows that the system was wholly inadequate to meet the demands made upon it by the city for the extinguishment of fires, and the sprinkling and watering of the public grounds and parks, and to supply the people who resided within the system with water necessary for household purposes and the sprinkling of lawns. It was apparent that the immediate expansion and prospective growth of the city, and the rapid increase in pop-

ulation, which the evidence shows actually occurred during the next ensuing two years, would increase the demands for water, which were already far in excess of the capacity of the system to furnish. A committee on water supply appointed by the city council, in its annual report to the mayor and city council for the year 1888, stated and recommended, in part, as follows: "For the summer season, you well know that the supply is not near sufficient, and, considering the rapid growth of our city, it will be wholly inadequate for the coming season. . . . Immediate steps should be taken to secure a full supply, which should be at least doubled." So great was the need and demand for more water that the question of a more adequate supply thereof, or a new system, was made a campaign issue at the municipal election in Ogden City in 1889, and a mayor and city council were elected on a promise by them to furnish an additional supply of water or a new waterworks system.

Owing to an act of Congress prohibiting any municipal corporation in any of the territories of the United States becoming indebted in any manner or for any purpose to an amount, including existing indebtedness, exceeding four per centum on the value of the taxable property within the corporation, and providing that all bonds or obligations in excess of such amount should be void (Act July 30, 1886, c. 818, 24 Stat. 171), Ogden City, on account of its limited borrowing capacity, was therefore unable, either by taxation or the issuing of bonds, to improve its water system so as to meet the requirements for more water, and make other needed improvements of almost equal importance. An appeal was made to Congress, and a bill was passed authorizing an increase of the city's bonding capacity, but the bill was vetoed by the President. These matters are referred to as they tend to show the necessity of, and the almost universal demand that was being made by the inhabitants of the city for, more water.

In 1889 Ogden City entered into a written agreement with one J. R. Bothwell, whereby said Bothwell

contracted and agreed to provide the city with a good and sufficient system of waterworks. The agreement, so far as material here, is as follows:

"That upon the completion and operation of the system within the time designated, that in consideration of the benefits and advantages herein secured to said city, the city will lease to him for the full time that said Bothwell or assigns furnish water through this system for municipal purposes the water right now owned by it for an annual rental of $1.00.

"And said John R. Bothwell, in consideration of the grants and privileges accorded herein by Ogden City, promises and agrees as follows: . . .

"That within one year from the date hereof he or his assigns will have in operation a complete distributive water system, furnishing this city and her inhabitants with a plentiful and ample supply of water, suitable for domestic purposes, continuously from the mountains, immediately east hereof.

"That he will supply and establish all the fire hydrants that said city may from time to time require, of a style and quality to be approved, and at such places as shall be designated by the city.

"That in view of the contemplated purchase by the city, she may exercise the right of examining bids and bills rendered against said John R. Bothwell, or assigns, and if deemed excessive or uncalled for shall state the same, and such objection shall be presented and maintained.

"Ogden is given the right at any time, at its option, to purchase the entire distributive system emanating from the mouth of the conduit, at the original cost of construction, and may pay for the same in cash or in six per cent bonds of the city provided they be legal and valid.

"It is understood and agreed that the rates and rentals charged by John R. Bothwell and his assigns shall not exceed the attached schedule for city purposes,

and shall not exceed ninety per cent of the present rates to other consumers, and in three years there shall be a further reduction of 10 per cent, and in six years another reduction of 10 per cent from the present rates. . . .

"It is further agreed that the basis of charge to consumers shall not be changed from that now used except by the approval of the city council first obtained."

Bothwell on September 25, 1889, assigned the contract to the Bear Lake & River Waterworks & Irrigation Company, a corporation organized the same day, and the corporation immediately commenced the construction of a new waterworks system, which it completed about April 1, 1891. The new system was entirely distinct, separate, and apart from the old system. During the time the new system was in the course of construction, water was furnished Odgen City, and the inhabitants thereof, through the old system, no part of which was used in the construction of the new, except about twenty hydrants which were taken from the old system, after the city had ceased to use them, and placed in the new. After the water had been turned out of the old system, the city continued to exercise ownership over it. With the exception of the twenty hydrants referred to, which were placed in the new system, the record fails to show that the defendants, or their predecessors in interest, ever exercised ownership or control over any part of the old system, except to keep it in repair and supply the city and inhabitants with water through it during the time the new system was in the course of construction. After the use of the old system was abandoned, the pipes and material of which it was composed were dug up, and the iron sold as junk.

Counsel for respondents, in their brief, have, by comparison, correctly summarized the facts respecting the efficacy and utility of the respective systems, as follows: "In the old system all of the intake pipes and distributive pipes were of wood. The distributive pipes of the new were of metal—what is known as 'kalamein pipe;' steel pipe coated with kalamein to prevent rust

and corrosion from alkali. The old system had about eleven miles of distributive mains, and about forty hydrants. The new system has thirty miles of distributive pipe, and over one hundred hydrants. The intake pipe from Ogden river was an eight-inch pipe. In the present system the water is carried from Ogden river in pipes twenty-four inches in diameter. Through the old system there was distributed .98 of a cubic foot per second of water. Through the new system there is distributed by the new water company 4.7 cubic feet of water per second. The old reservoir, from which the old system was supplied, had a capacity of 250,000 gallons. The capacity of the new reservoir (lowest estimate) is 6,500,000 gallons. The old reservoir was located so low down in the city that it could not supply all the residents with water, and furnished a very inefficient service to many others who were connected with the system. The new reservoir was built two hundred and forty-seven feet higher than the old. The effective pressure of the old system was from fifteen to twenty pounds per square inch. The pressure of the new system is from fifty-six to one hundred and eighty-five pounds to the square inch.''

Ogden City had not improved its parks and public grounds, and the parks were not irrigated. Since the completion of the new water system the city commenced to improve its public parks and grounds by using the water from this system for beautifying them. The city hall grounds were not improved prior to the completion of the new water system. Since that time the city has expended considerable time and labor in improving these grounds.

The Bear Lake & River Waterworks & Irrigation Company on the first day of October, 1889, gave a trust deed upon all its property then owned and to be afterwards acquired to secure the payment of $2,000,000 of its bonds. This trust deed covered, among its other property, the Ogden waterworks system. Default having been made in the payment of the interest on the

bonds, the trust deed was foreclosed by suit, and on the first day of September, 1894, no redemption having been made, the marshal made a deed to the Bear River Irrigation & Waterworks Company of the property formerly owned by the Bear Lake & River Waterworks & Irrigation Company, and the Bear River Irrigation & Waterworks Company continued to be the owner of the property until the commencement of this suit.

On July 10, 1897, more than six years after the new waterworks system had been entirely completed, and connection had been made by all consumers with the new water system, the plaintiff, Ogden City, commenced this action to have the Bothwell contract, under and by virtue of which the new system of waterworks was constructed, declared null and void, and that the city be declared to be the owner and entitled to the possession of the new waterworks system, and that the defendant Bear River Irrigation & Ogden Waterworks Company be required to surrender to plaintiff the possession, operation, and control of the same, and every part thereof, and "that plaintiff have judgment against defendants for the sum of $150,000, the rental value of said water system and water from the twenty-seventh day of October, 1890, to the present time" (July 10, 1899). Defendants answered, denying the material allegations of the complaint relied upon for a recovery, and, as a further defense, pleaded the statute of limitations, and that plaintiff, by its own acts, is estopped from asserting any claim, title, or lien to the waterworks system. Then follows a detailed statement of the acts of plaintiff constituting such estoppel, among which are (1) that plaintiff, since the execution of the contract referred to, has, by its committees and its own official action, repeatedly and continuously recognized the validity of the contract, by permitting said company to construct a waterworks system at a cost of $500,000; (2) in paying said company large sums of money for the use of the fire hydrants mentioned, and by receiving the use of the water free for flushing sewers, and by using water from said

water system for city buildings, public schools, and grounds, public fountains, city squares and lawns, city street sprinkling, and for all ordinary municipal uses; (3) by assessing, levying, and collecting taxes for municipal purposes on said waterworks system from the year 1891 to the commencement of the action, amounting to $9,670; and (4) by permitting said property to be sold under mortgage foreclosure proceedings to the defendant herein without intervening in said suit and setting up whatever right or interest it may have claimed or asserted to the property in question.

The trial court found the issues in favor of defendants, and, as conclusions of law, in part, found "(3) that the said contract between the said John R. Bothwell and said Ogden City was and is a legal and valid contract, binding upon said John R. Bothwell and his assigns, upon the one hand, and upon Ogden City, upon the other; (4) that, after the adoption and execution of said contract by Ogden City, said Ogden City, for a number of years, and until a short time prior to the bringing of this suit, fully approved and ratified and confirmed said contract, and the manner of its adoption and execution; (5) that said Ogden City is, by its conduct, estopped from setting up or claiming that said contract is invalid and not binding upon said city, or not legally adopted and executed by it;" and (6) that the claim for the hydrants belonging to the waterworks owned by Ogden City, or the value thereof, and for all trespasses upon said waterworks system, were at the time of the commencement of this suit barred by the statute of limitations (giving sections). A decree was accordingly entered in favor of defendants, and the suit was dismissed for want of equity. Plaintiff appeals.

McCARTY, J., after making the foregoing statement of facts, delivered the opinion of the court.

While it is charged and alleged in the complaint, in general terms, that the contract entered into between Bothwell and Ogden City for the construction of the new waterworks system was fraudulent and collusive,

and entered into for the purpose of sequestrating and forever destroying the waterworks system then owned by the city, there was not one scintilla of evidence offered to support these sweeping allegations; and there is absolutely nothing in the record that even suggests that any member of the city council or other officer of the city was guilty of fraud, or that the contract was procured through fraud or collusion, but, on the contrary, the record shows that the mayor and members of the city council acted honestly, and did only what they considered to be for the best interests of the city and the inhabitants thereof. In fact, appellant does not claim anywhere in its elaborate printed argument that any official who was in any way instrumental in having the contract entered into was actuated in what he did in the premises by any but the best of motives. Counsel for appellant, in their brief, say: "It is the contention of plaintiff that this contract is void for the reason, first, that it was beyond the power of the city to make such a contract, that the terms of said contract were *ultra vires* and that it is fraudulent; [and second] that neither the city nor its officials had power to lease or turn over its water system as was agreed to be done in said contract, and finally carried out by subsequent acts and resolutions." And they further say that "the right of the city to have made a proper contract for the construction of waterworks at the time it attempted to do so with Mr. Bothwell is not questioned." And again: "It is not contended that if the city had made a proper and legal contract, under the method provided by law, with Bothwell, for the construction of waterworks, that the contract would have been *ultra vires* or invalid." But they contend that the consideration given by the city was illegal, and that the formal methods required by law were not observed and followed by the city in making the contract.

The record in this case shows conclusively that, at the time the contract referred to was made, Ogden City was in need of more water, and a larger and better sys-

tem of waterworks. Not only was the water owned and controlled by the city insufficient to meet the demands made on it by the people who were entitled to its use, but the system of reservoirs and pipes was too small to carry a plentiful supply of water, even if there had been an abundance of it. And there is evidence in the record that tends to show that the system itself had about outlived its usefulness. F. J. Kiesel, who was mayor of Ogden City at the time the contract was entered into, testified on this point as follows: "It was a matter of notoriety prior to 1889 that the water system and water supply were inadequate and insufficient. . . . My understanding was that the system was giving out generally everywhere, and that it had about done its work, and it was necessary to put in a new system. It was reported from the water committee and from the water master that the system was giving out everywhere." Appellant does not contend but what the conditions were such as to demand of the city government immediate action on its part to provide a more liberal supply of water for the city and the inhabitants. Neither does it contend that the concessions made by the city to defendant company are disproportionate to the benefits received.

Counsel for appellant have devoted much space in their brief to the discussion of the proposition involving the right of the city to sell, transfer, and turn over to defendant company the "old waterworks system." While the record discloses that the defendant company took possession temporarily of the old system during the time it was laying the pipes and putting in the new system, yet it did so only for the purpose of furnishing water to the city and its inhabitants until the water was turned into and delivered through the new system. And during this time defendant company operated and kept the old system in repair without cost or expense to the city, and delivered the water free. Niels Knudsen, a witness for appellant, testified, in part, as follows: "While I was working for the city in April or May,

1890, for eight or nine months, I collected money for the city for water rates. The water rates were payable six months in advance. The Bear Lake & River Waterworks & Irrigation Company, so far as I know, did not collect a dollar of water rates while they were operating the old water system. They had me run the old system until they had the new system ready to turn the water into it. And they were having me and paying me to look after it until the new system was ready to receive the water. When the water was turned into the new system, the old water system was abandoned. About a year after the old system was abandoned, it was dug up in different places of the city. The hydrants were taken off the old system when it was abandoned. . . . They were dead property and of no service whatever. . . . I do not know whether the people I saw digging were working for the city or not. They were not working for the new company." There is an abundance of evidence in the record to the effect that the city and the people generally, by permission of the city authorities, "dismantled and destroyed" the old waterworks system after it was abandoned, and not the defendant company, as alleged in plaintiff's complaint. The finding of the trial court on this issue, which was in favor of respondents, is supported by a great preponderance of the evidence, and cannot be disturbed. Therefore the question as to whether it was a wise and proper thing for the city to abandon the old waterworks system, and permit it to be dismantled and destroyed, or whether the city authorities were derelict in their duty respecting the disposition made of it, is unimportant to the determination of this case, as it does not appear that defendants, or their predecessors in interest, had anything to do with it after the water was turned off and it was abandoned by the city.

The resolution adopted and passed by the city council of Ogden City, October 24, 1890, authorizing the defendants to take possession of the old waterworks system, so far as material here, is as follows: "Be it re-

solved by the city council of Ogden City that the city water and system be turned over to the Bear Lake & River Waterworks & Irrigation Company on October 27, 1890, under the terms of the contract with them." The contract referred to in the resolution is the Bothwell contract, a portion of which is set out in the foregoing statement of facts. By an examination of the contract, it will be seen that it provides that an entire new system of waterworks should be put in, which was done. It also provides that, in consideration of the benefits and advantages to be gained by the city and the inhabitants thereof by the construction of the new system, and secured to them by the terms of the contract, the said Bothwell was granted the use of the streets for the purpose of laying water pipes for the system, and that the city would lease to him for an annual rental of $1 the water right owned by it.

And we have observed, the record shows that the defendants took only temporary possession of the old waterworks system, and were in no way responsible for its destruction. Therefore the important and controlling question in the case is, did the city council exceed its authority in leasing and turning over to defendants the water right owned by the city, with which the city and the inhabitants thereof were furnished with water through the old waterworks system, and was the act *ultra vires?*

Section 1, subd. 14, art. 4, c. 48, p. 116, Sess. Laws Utah 1888, provides that the city council shall have power, among other things, "to construct and maintain waterworks . . . or to authorize the construction and maintenance of the same by others." It will thus be seen that the power to contract for the construction of a waterworks system was expressly given Ogden City by the provisions of the foregoing legislative enactment. But complaint is made that this power was irregularly exercised, in that the contract was made in pursuance of a resolution passed by the city council, and not by ordinance. The making of the contract was

an exercise of the business powers and functions of the municipality, and was not in any sense legislative in character; and it is settled by the great weight of authority that where a municipal corporation, in the exercise of its business powers, makes an authorized contract, it has the same rights and remedies, and the obligations imposed thereby are the same as those accorded to and incurred by individuals. 1 Dillon, Mun. Corp. (4 Ed.), 472. In the case of Illinois Trust & Sav. Bank v. City, 76 Fed. 282, 22 C. C. A. 181, 34 L. R. A. 518, Sanborn, J., speaking for the court says: "A city has two classes of powers—the one legislative, public, governmental, in the exercise of which it is a sovereignty and governs its people; the other proprietary, quasi private, conferred upon it not for the purpose of governing its people, but for private advantage of the inhabitants of the city, and of the city itself as a legal personality. In the exercise of the powers of the former class, it is governed by the rule here invoked. In their exercise it is ruling its people, and is bound to transmit its powers of government to its successive sets of officers unimpaired. But in the exercise of the powers of the latter class it is controlled by no such rule, because it is acting and contracting for the private benefit of itself and its inhabitants, and it may exercise the business powers conferred upon it in the same way, and in their exercise it is to be governed by the same rules that govern a private individual or corporation. Dill. Mun. Corp. (3 Ed.), sec. 66, and cases cited in note; Safety Insulated Wire & Cable Co. v. City of Baltimore, 13 C. C. A. 375, 377, 378, 66 Fed. 140, 143, 144; San Francisco Gas Co. v. City of San Francisco, 9 Cal. 453, 468, 469; Com. v. City of Philadelphia, 132 Pa. 288, 19 Atl. 136; New Orleans Gaslight Co. v. City of New Orleans, 42 La. Ann. 188, 192, 7 South. 559, 560; Tacoma Hotel Co. v. Tacoma Light & Water Company, 3 Wash. St. 316, 28 Pac. 516, 519, 14 L. R. A. 669, 28 Am. St. Rep. 35; Wagner v. City of Rock Island, 146 Ill. 139, 154, 155, 34 N. E. 545, 548, 549, 21 L. R. A. 519; City of

Vincennes v. Citizens' Gaslight Co., 132 Ind. 114, 126, 31 N. E. 573, 577, 16 L. R. A. 485; City of Indianapolis v. Indianapolis Gaslight and Coke Co., 66 Ind. 396, 403; Read v. Atlantic City, 49 N. J. Law 558, 9 Atl. 759. In contracting for waterworks to supply itself and its inhabitants with water, the city is not exercising its governmental or legislative powers, but its business or proprietary powers. The purpose of such a contract is not to govern its inhabitants, but to obtain a private benefit for the city itself and its denizens.''

Ogden City, having, under and by virtue of the provisions of the contract, permitted the construction of the waterworks, and for more than six years availed itself of the benefits and advantages derived from the system and having assessed and collected an annual tax thereon, and stood by and permitted the present owner to acquire title to the property without asserting any claim or title in the municipality to the same cannot now be heard to question the validity of the instrument, and avoid the obligations imposed by its terms, and thereby be permitted to, in effect, confiscate property, the assessed value of which the record shows to be $225,000. ''A corporation is estopped to deny its liability under a contract on the ground that the officers were not technically authorized to make it, or that its own proceedings in the premises were irregular, when the contract was within the scope of its powers, was entered into by proper officers, and has been recognized by the corporate city.'' Reese, Ultra Vires, 51, and cases cited in note. In the case of Ogden City v. Weaver, 108 Fed. 564, 47 C. C. A. 485, 'the·validity of this same contract was incidentally involved, and in the course of the opinion the court said: ''But even if the bill of exceptions did disclose a distinct ruling upon the first of the above objections, we should be of the opinion that it was untenable, inasmuch as the statute of Utah did not, in terms, provide such agreements as the one here involved should be executed in pursuance of an ordinance, and not otherwise, and inasmuch as the contract

appears to have been spread at large upon the records of the city, and to have been treated by it as valid for a period of years. Under such circumstances, the fact that the council approved the contract, and authorized its execution by a resolution, and not by ordinance, cannot be regarded as affecting its validity after the lapse of time."

Appellant insists that the contract is void because a part of the consideration therefor was the leasing by the city of its water right, which had been dedicated to a public use, to Bothwell, for an annual rental of $1.

By an examination of the contract, it will be seen that the real and true consideration for this lease was the construction of an entirely new water system; the furnishing to the city of a plentiful supply of water free for public parks, for lawns and grounds around the public buildings, and for sewerage purposes; also for improved fire protection; and an additional supply of water to the inhabitants of the city at a less rate than had theretofore existed. While the record does not disclose the exact quantity of water furnished to the city free under the lease, yet it is evident from the numerous public uses made of the water that the city used, without cost or expense of any kind on its part, a quantity equal to, or greater than, that leased to defendants. The payment of the nominal money consideration of $1 provided for in the lease was evidently exacted as an annual acknowledgment of the city's title on the part of the lessee, and, as stated, not the real or true consideration. And further, the water has not been diverted from the uses to which it was dedicated. The only change made is that it is being distributed by a private corporation instead of a public corporation.

In view of the conditions that existed and confronted Ogden City at the time the lease was made, we are of the opinion that the city council not only acted within its authorized powers in authorizing its execution and afterwards ratifying it, but that, under the circumstances, those powers were wisely exer-

cised, for it is apparent that, after the city had decided to abandon its old waterworks system, it was necessary to make some disposition of its water right; otherwise, in course of time, it would be lost by nonuse. Los Angeles City Water Co. v. City, (C. C.) 88 Fed. 720. Not only are the interests of Ogden City provided for and guarded by the terms of the contract, but the city is given the option to purchase at any time the entire system, at its original cost of construction. In the meantime the city is being furnished free with a plentiful supply of water for all public purposes, except fire hydants, and it is not claimed that the rates charged for these are unreasonable, and the inhabitants are receiving a more liberal supply than they did under the old system, and at rates thirty per cent lower than those fixed by the city under said system. Under these circumstances, to hold the contract void because of some informality in its execution, and turn over to Ogden City this water system, which the record shows the predecessors in interest of defendant company, relying upon the terms of the contract and the good faith of the city, constructed at a cost of many thousands of dollars, would, in effect, as hereinbefore stated, be a confiscation of the property, and in direct violation of section 22, art. 1, Constitution of Utah, which provides that "personal property shall not be taken or damaged for public use without just compensation." Plaintiff not only asks the court to enter a decree confiscating this property to it without any compensation whatever to the owner thereof, but demands a money judgment against such owner (defendant company) for the sum of $150,000. We venture to say a parallel to such a decree, based upon a similar state of facts, cannot be found in the history of American jurisprudence.

The judgment of the district court is affirmed, with costs.

BASKIN, C. J., and BARTCH, J., concur.