168 So. 159

**BROWN et al. v. TUSKEGEE LIGHT & POWER CO.**

5 Div. 208.

Supreme Court of Alabama.

May 14, 1936.

Jacob A. Walker, Thos. D. Samford, and Thos. D. Samford, Jr., all of Opelika, for appellants.

Rushton, Crenshaw & Rushton, of Montgomery, and Powell & Powell, of Tuskegee, for appellee.

BOULDIN, Justice.

Broadly speaking, the purpose of the suit in equity was to assert title and right of possession on behalf of the city of Tuskegee in an electric lighting system in possession of and being operated as a public utility by Tuskegee Light. & Power Company, a corporation. The original bill was filed March 18, 1933, by individual appellants, as citizens and taxpayers, making the city of Tuskegee, a municipal corporation, party respondent. The city, by answer and statutory cross-bill, admitted the substantial averments of the original bill, and sought the same. relief.

On final hearing the trial court denied relief on both original and cross-bills.

Separate appeals are prosecuted.

The matters complained of date back to 1919, more than thirteen years before the filing of the bill. The theory of the bill is that the initial light plant was owned and operated by the city of Tuskegee; that the town council undertook to lease or dispose of same to respondent corporation without authorization by vote of the qualified electors of the town in an election called for the purpose as required by section 2 of an act of the Legislature at Special Session 1909. General and Local, etc., Acts of 1909, p. 253 et seq.

A further charge is that the majority and dominant members of the governing body were adversely interested as stockholders in respondent corporation; a matter not disclosed by the charter or corporate records at the time.

That no preliminary resolution was passed as per above statute, nor election held is admitted; admitted also that members of the council were beneficial owners of stock in the corporation organized for the purpose of succeeding and relieving the city of the obligation to furnish electric light and power service to the city and to its inhabitants.

The entire history of the transaction, and the events of succeeding years are presented in pleading and proof in a rather voluminous record.

Able and elaborate briefs on both sides present the contentions of the parties; both of law and fact.

On November 21, 1919, the city council. passed a resolution, as follows:

"Whereas, the City of Tuskegee is desirous of having adequate and sufficient electric light and power service. .

"And, whereas, with its present apparatus, engines and equipment it is unable to provide the same.

"And, whereas, it is possible, or appears possible that private capital' may be induced to take over the line of the City and furnish lights and current for power;

"Be it resolved by the City Council of the City of Tuskegee of the State of Alabama as follows:

"1st. That the City make and offer to any corporation or individuals to grant it or them the following:

"1. A perpetual franchise; the use of its lines, poles, transformers and rights of way and such other equipment as may be hereafter agreed upon.

"2. And agree to charge no license fee for the operation and maintenance of an electric lighting system for said city.

"In consideration of which

"The Company agrees to maintain the said lines and equipment as furnished by the City and to install and maintain 50 200-watt street lights on the city streets and in consideration of which it shall maintain an adequate and suitable lighting system and furnish 24 hour a day current to customers at rates not in excess of those now charged by the said City.

"And, in consideration of its furnishing adequate and sufficient current for pumping the City water at a rate not in excess of three cents per 'K. W. hour."

■ Events and conditions leading to this resolution may be summarized thus: The city then owned a municipal light plant, first installed about 1905. The plant in 1919 consisted of a generating plant, and distribution system furnishing lights to the city streets and to domestic consumers, and small power consumers. It ' was a going and functioning plant. We hold, without elaboration, that the whole was an electric light plant within the meaning of the statute.

We further find that the recitals in the preamble of the above resolution, to the effect that the city was unable with its present equipment to provide adequate and sufficient electric light and power service, were true, and expressed the bona fide

judgment and finding of the members of the city council, leading business and professional men, fully informed by actual experience.

The city also owned its waterworks. Power from the light plant was used to run the pumping station. Lack of adequate water service, especially for fire protection, sufficiently appears. Owing to high prices of coal in 1919, operating expense was heavy. The mayor, at times, advanced the funds to buy coal to keep it going. Light and water rates were high.

Omitting further details, the plant was not esteemed a valuable asset.

Some years before, the Alabama Power Company had extended its high voltage hydro-electric power lines to Auburn, some twenty miles from Tuskegee. The town council, as well as interested citizens, conceived it much to the advantage of Tuskegee to bring that power to the city. Efforts had been made to this end for some years. Finally, through a committee of the council, a tentative promise had been obtained from the Alabama Power Company to build a line into Tuskegee on condition that $30,000 be paid in advance, with provision that this sum be refunded by deductions from annual bills for current sold, if, and when the annual returns from current furnished should exceed a stated sum.

The city had neither money nor credit to obtain the required sum of $30,000. Thereupon, leaders on and off the town council collaborated in promoting a private corporation, Tukegee Light & Power Company, with $30,000 cash capital. Promptly a subscription list was circulated among the citizens deemed financially able to take stock. Members of the council actively participated in the movement and took about one-fifth of the stock in the names of friends or kindred.

A charter was speedily obtained and an offer presented to the town council to accept the proposition made by the city in the above resolution.

Thereupon, the town council, on November 25, 1919, adopted an ordinance reciting the history to that date, and ordaining:

"That the City of Tuskegee, does hereby lease, turn over and deliver to the Tuskegee Light & Power Company, its successors, or assigns, a' private corporation, its Electric Light Plant, and all fixtures connected therewith, that may be needed in the conduct of said business by said corporation, together with the electric wires, poles, cross arms, transformers, and fixtures of every nature and description, connected therewith, and needed in the management of said business; with the right to use the Power House and appurtenances thereunto belonging, and grounds around same; all machinery, apparatus and fixtures connected therewith, or contained therein, where such are needed by said Corporation. Such property as is not needed by said Corporation, when it takes over the said Plant and fixtures, as herein described, to be delivered back to said City, and sold and disposed of by it, as it sees fit. And the said City of Tuskegee does hereby grant to said Tuskegee Light & Power Company the authority and right to use the lines of said Light Plant as now located in, on, or upon the Streets of said City; to maintain said lines, replace said poles, replace said wires and other fixtures connected therewith, construct new poles, and add new wires and other fixtures when necessary and in all respects to use, maintain and operate the said plant and lines connected therewith, as fully and completely as has been done, or could be done by said City itself."

The ordinance further granted a franchise for the use of streets and public places in furnishing electric service throughout the city limits. In consideration of which the light company bound itself to maintain adequate 24-hour service for light and power purposes, to furnish current for 50 street lights, to fix rates to consumers not in excess of those in force, and to furnish power to the waterworks at not exceeding 3 cents per K. W. hour.

Thereupon, the light company paid over to the Alabama Power Company the $30,-000, made a contract with that company to construct the power line and furnish current at lawful rates. The council granted Alabama Power Company a franchise to enter the city.

Pending a construction of the power line, the city continued to operate the plant. But the light company, at the same time, proceeded to repair, reconstruct, or improve the distribution system to meet the requirements of engineers looking to the new and high voltage service. Both city and light company functioned during this interim through the same management.

The light·company, in this preparatory work, expended in improvements and replacements a sum variously given at $6,500 to $10,000. The company never took over the generating machinery. The city sold the older and larger of the two units, and the newer and smaller one was turned back to the vendors under conditional sale contract. Default on the indebtedness had already intervened.

The original ordinance required the light company to begin operations by November 25, 1919. This was stipulated as a condition to the grant or franchise from the city. Owing to delay in finishing the power line, a further ordinance extended this time limit. Councilmen interested in the company voted for and obtained such extension.

The new power was cut in and the light company took full control January 1, 1921. Since then it has operated as a public utility under the supervision and rate schedule of the Public Service Commission of Alabama. It has regularly paid taxes to the city, furnished power to street lights and the waterworks, and, without dispute, complied with the terms of its franchise and ordinance.

After a few years, the light company prospered. In 1922, the federal government located at Tuskegee a large Veterans' Hospital for colored ex-service men. This institution, as appears from reports of the light company to the Public Service Commission, consumes more current from year to year than the entire domestic consumption of the town.

Tuskegee Institute, while owning its own light plant, has, by enlargement, contributed to the growth of the business and residence sections of the city.

The population of the town, during the decade from 1910 to 1920, had decreased 11 per cent. During the decade from 1920 to 1930, its population increased 33 per cent.

Tuskegee Light & Power Company, meantime, was under efficient management. Extensions were made into neighboring communities. In one or two instances prospective consumers paid for the extension lines to get the benefit of the service. Income and stock values enhanced. By the fourth year, deductions began to accrue on service bills from Alabama Power Company, and at the time of the filing of the bill such deductions had made full return of the $30,000. Profits from the business had reimbursed the company for all outlays. Most of the original stockholders sold their stock within a few years at increasing prices, practically all with good profits on their investments. Ultimately all the stock was acquired by two men, who had been connected with the project from the beginning, and one of whom devoted his time, energy, and business ability to building the business. In 1930 these two sold the entire stock to nonresident interests at and for $250,000. These latter investors acted on the advice of counsel, sent from another state, and their good faith is not questioned.

The new management, soon after acquiring the properties, obtained a certificate of convenience and necessity from the Public Service Commission for an extension to Shorter, a distance of 17 miles. The line was constructed at a cost of some $40,000, and became a part of the system.

With singular unanimity, the evidence discloses that the men who wrought on behalf of the city and ultimately profited much were men of integrity, business men, leaders in the promotion of the civic interests of the town. The failure to comply with the law in holding an election was not with intent to ignore or violate the law, nor to avoid a popular expression on the venture. Without dispute, legal counsel was engaged to direct matters according to law, who prepared the ordinances and resolutions according to his view of the Code, overlooking the uncodified statute of 1909. This is said, not to question the general rule that all persons are charged with a knowledge of the law governing their transactions, that ignorance of same is no excuse; but, as a matter of justice between men, and going to the question of intent where equitable rights are to be considered on the whole record.

Touching the taking of stock by members of the council, we think the following is the correct view as disclosed by the record.

The city was undertaking to furnish electric light and power service, a corporate or proprietary enterprise, not strictly governmental, but a business charged with a public service as other public utilities.

As public officials, they were expected, and recognized an obligation to take steps to obtain an efficient and economical service. By common consent, the advisable thing was to bring in a full supply of elec-

tric energy from the Alabama Power Company. The city was not in position to do so. Resort must be had to interested citizens to put up the money.

As matters then appeared, it was quite debatable whether stock would be a safe investment. The surest way to interest others was to put in their own money. They were expected to do so. There was no concealment of the fact from the citizens invited to take stock. It was concealed on the records, we conclude, with full advice that otherwise they would be subject to impeachment under the Code, § 1913. We may assume they also had an eye to avoiding legal complications thereafter.

Not minimizing the impropriety or legal effect of such procedure, it is but just to say the paramount motive throughout, was to obtain the benefits of adequate electric light and power service for themselves and the people of Tuskegee with the prospective growth and prosperity expected to follow. We do not hold these business leaders did not believe it would prove a successful and profitable business venture under their personal management. The great profits, which, because of unforeseen events, did accrue, were entirely unexpected. In a word, it cannot be said they were intentionally putting their own interests above the interests of the town; seeking profits at the expense of the city or its citizens. Events proved the city, its inhabitants, and the investors all reaped decided benefits.

This cannot be said of the present owners of the stock, the beneficial owners of the plant as it now is, at a total outlay of some $300,000.

Appellants now insist, and the appeal is based on the proposition that in equity, the city owns the entire plant as it now is, seeks to have it delivered over intact to be operated as a municipal plant, and to have an accounting by the company under present ownership for all profits. In effect, it means a dissolution and end of Tuskegee Light & Power Company by stripping it of all properties and taking over the business it was formed to carry on.

What is the answer of a court of equity to the case presented?

The act of 1909, chiefly relied upon by appellants, was considered in Wakefield et al. v. Town of Carbon Hill et al., 215 Ala. 22, 23, 108 So. 855, 856, wherein taxpayers filed a bill to enjoin a sale of municipal waterworks and lighting plant, for illegality because of fraud in an election to authorize such sale. Said the court, quoting first from the Supreme Court of the United States:

" 'Of the right of resident taxpayers to invoke the interposition of a court of equity to prevent an illegal disposition of the moneys of the county or the illegal creation of a debt which they in common with other property holders of the county may otherwise be compelled to pay, there is at this day no serious question.' Crampton v. Zabriskie, 101 U.S. [601] 609, 25 L.Ed. 1070.

"The same rule must apply to prevent the illegal disposition of the public property of an incorporated town. Such property is held in trust for the public. Douglass v. Montgomery, 118 Ala. 599, 24 So. 745, 43 L.R.A. 376."

Property rights of the public, individuals composing the public being involved, the equity of a taxpayer's bill to enjoin an illegal sale was upheld, notwithstanding the fraud and illegality pertained to an election under this statute, making no provision for a contest. On like principles we are of opinion a taxpayer's bill to enjoin a sale as illegal because no election is held would contain equity.

■ Injunctive relief is usually granted as the appropriate remedy to prevent inequitable results to follow from litigation after a transaction has been fully executed.

We note here that taxpayers had full knowledge from the beginning that no election was held.

The case of Douglass v. City Council of Montgomery, 118 Ala. 599, 24 So. 745, 43 L.R.A. 376, cited in the Wakefield Case, supra, was a bill in equity to enjoin the diversion of a public park from the uses to which it was originally dedicated. The bill was filed by taxpayers and residents having a special interest in the park. Without considering whether any and every resident taxpayer of the city had such interest as would support a bill of injunction, it was declared, generally, that the realty, dedicated to public use as a park, could not be diverted to the uses of a railroad company. The doctrine of trustee and cestui que trust as between the city and its inhabitants was recognized.

As we view this case, it is unnecessary to consider numerous lines of argument on both sides, with review and citation of

many authorities such as estoppel, laches, and the statute of limitations, as applied to cases growing out of the disposition and operation of municipal plants.

Distinctions between municipal acts merely ultra vires and those which are illegal because in violation of positive law, as affecting such suits, often turn on who is the actor in the suit, the nature, and purpose of the action.

Ownership and operation of a municipal light plant has quite different incidents from public parks or public streets, as in Webb v. City of Demopolis, 95 Ala. 116, 13 So. 289, 21 L.R.A. 62.

The former involves the operation of a business; its property and equipment are perishable, consumed, or worn out with the using. We would not, by implication, be understood as holding that taxpayers or interested citizens could, after a city has gone out of the power and light business, dismantled and disposed of its plant, require the city by suit in equity to recapture such properties, and re-enter the business. Such issue involving outlays and income from a business venture would seem to be a matter for the entire body of cestui que trustent, so to speak of its citizenship, acting through their chosen governing body, and not for a few citizens, at their option, on the ground that they had some property rights which had been illegally disposed of in the past.

But proceeding on the assumption that the action of the town council was wholly illegal, violative of positive law in the respects we have hereinabove discussed, does either the city or interested citizens make a case for the equitable relief sought? Has either any equitable right or title to the plant of the Tuskegee Light & Power Company?

In the first place the light company did not in the first instance take over that of the city. In fact, that plant was dismembered, the city retaining the generating equipment, and the light company for a valuable consideration taking such part of the distribution system as was of use in the new hydro-electric plant.

The city disposed of the generating equipment for its own benefit, in which the cestui que trust shared.

Clearly, in the light of events, the good thing for all concerned, was bringing in abundant hydro-electric power. This, in a sense, was in lieu of the generating system retained and disposed of by the city to other parties. This achievement was wholly and solely the work of the light company, at its own expense. The entire capital, $30,000, went into this. This outlay made possible all that has been achieved in bringing to Tuskegee, the city and its citizens, the benefits of adequate and cheaper service, to say nothing of its contribution to the growth in population, business, and property values.

The only part of the city's plant ever received by the light company was such part of its distribution system as was usable in the new system. Much testimony and argument is devoted to the condition and value of such property. We need only say that the poles were largely, probably more than half replaced by new poles, new wiring, cross-arms, additional transformers, etc. This part of the original plant was virtually reconstructed before the light company began operations. Safe to say the total outlays by the company before beginning operations was several times the value of what the city turned over in consideration for street lighting, etc.

Since then numerous extensions, with accompanying outlays, contracts, franchises, have been made or obtained by the light company. All the legal obligations of a public utility to the public it serves have intervened.

The theory of the bill seems to be that the city has the equitable right, in a suit against the light company as sole party, to step into its shoes, take over the property, with all accumulations, tangible and intangible, assume the position of a going utility, with the public duties and obligations now upon the light company.

All this seems to be rested on the concept that all this is merely an expansion or growth from an original plant taken over unlawfully by the light company.

In this connection much stress is laid on the fact that profits made have fully covered outlays by the light company. This does not apply at all to the present beneficial owners of the plant, the existing stockholders when this suit was filed. Their outlays have been heretofore noted.

While, in the view we take, it is not necessary to a decision, we think it proper to observe that for many years after full

knowledge came to the public generally, not only of noncompliance with the referendum statute, but of the interest of councilmen in the beginning, and after the city council was composed wholly of other men, such council refused to consider a motion made by one member looking to the assertion of a claim of this kind.

Some five years later, and after the ownership passed out of those charged with the wrong, this suit was begun.

The notion that the light company has been fully reimbursed for all its outlays from profits derived from a plant equitably owned by the city does not square with the facts. They were derived from the new plant created by the light company, in which city property formed a minor part, enlarged by extensions, all the result of the labor, energy, business enterprise, and management of the light company. On what principle of equity these should inure to the city, we are unable to appreciate. Unless these profits inured to the city, which is really asserted in the accounting feature of the bill, they cannot be equitably applied by way of reimbursement for the outlays of the light company.

We are, therefore, at the conclusion, upon full consideration of the case in its entirety, the granting of the relief sought would not square with justice and right, would be inequitable, and was, therefore, properly denied by the trial court. Abundant authority sustains such view.

Thus, in Town of Athens v. Miller, 190 Ala. 82, 91, 66 So. 702, 705, this court said:

"When a municipality engages in the business of furnishing electricity, lights, water, etc., to the public, it is not then discharging or exercising governmental functions or powers, but is, quoad hoc, exercising proprietary or business powers, and as to such business it is governed by the same rules of law which are applicable to ordinary business corporations engaged in like businesses. Bessemer City v. Bessemer Water Works, 152 Ala. 391, 44 So. 663; Darby v. Union Springs, 173 Ala. 709, 55 So. 889; Posey v. North Birmingham, 154 Ala. 511, 45 So. 663, 15 L.R.A.(N.S.) 711."

In State v. Mobile & O. R. Co., 201 Ala. 271, 273, 78 So. 47, 49, the court quoted with approval from decisions of other courts, such announcements as these:

" 'The underlying principle of all the decisions is that, when the sovereign comes into court to assert a pecuniary demand against the citizen, the court has authority, and is under the duty, to withhold relief to the sovereign, except upon terms which do justice to the citizen or subject, as determined by the jurisprudence of the forum in like subject-matter between man and man.' " United States v. Walker, 148 F. 1022, 79 C.C.A. 392.

" 'The state, in all its contracts and dealings with individuals, must be adjudged and abide by the rules which govern in determining the rights of private citizens contracting and dealing with each other.' " People v. Stephens, 71 N.Y. 527, 549.

We give no sanction to the method of procedure in 1919 and 1920, nor question the proposition that convenience or even public benefit cannot legalize acts forbidden by law.

The point is that advantage may not be taken of such want of authority to create a cause of action which in itself is inequitable and unjust.

The doctrine of ultra vires as applied to governing bodies is a shield for the protection of the public, not a weapon to inflict a wrong upon the individual for the benefit of the public.

In effectuating this elemental principle denying relief in equity which is not equitable, our court, in common with prevailing authorities generally, applies the doctrine of estoppel in pais even against the state or its governing subdivision. Such is the meaning, in effect, of State ex rel. Martin v. City of Gadsden, 216 Ala. 243, 113 So. 6, and State ex rel. Roberson v. Town of Pell City, 157 Ala. 380, 47 So. 246.

The case of Allen v. Intendant & Councilmen of La Fayette, 89 Ala. 641, 8 So. 30, 9 L.R.A. 497, raising an implied obligation to refund money borrowed without authority of law, but applied to legitimate municipal purposes, is based on a like principle of justice.

Judge Dillon states the rule thus:

"The defense of equitable estoppel may be asserted against a municipal corporation when the character of the action and the facts and circumstances are such that justice and equity demand that the corporation should be estopped." Dillon on Municipal Corporations (4th Ed.) 675.

Mr. McQuillin says:

"Any positive act by municipal officers which may have induced the action of the adverse party, and where it would be inequitable to permit the corporation to stultify by retracting what its officers had done, will work an estoppel." McQuillin on Municipal Corporations (2d Ed.) vol. 3, § 1185.

In Iowa v. Carr, 191 F. 257, 266, 112 C. C.A. 177, quoted in 21 C.J. page 1186, we find:

" 'The great weight of authority, the stronger reasons and the settled rule upon this subject in the courts of the United States, is that * * * when a sovereignty submits itself to the jurisdiction of a court of equity and prays its aid, its claims and rights are judicable by every other principle and rule of equity applicable to the claims and rights of private parties under similar circumstances.' "

See, also, Utah Power & Light Co. v. United States, 230 F. 328, 144 C.C.A. 470.

Probably the most analogous case as regards the facts presented is Ogden City v. Bear Lake & River Waterworks & Irr. Co. et al., 28 Utah, 25, 76 P. 1069; Id., 16 Utah, 440, 52 P. 697, 41 L.R.A. 305, 306.

To be entirely clear, we hold that notwithstanding any illegality in the proceedings of the town council in 1919 and 1920, and consequent want of title in the light company to any part of the city's plant which went into its possession, no equitable right ever arose to take over the plant of the light company as it was at the time this suit was filed. Hence, the doctrines of estoppel, laches, and statute of limitations, cutting off equitable rights once existing, need not be considered in their application to the facts here presented.

It seems to have been recognized in framing the bill, and presenting the case on appeal, that no other substantial relief could be had without running counter to the rights of the large consuming public to service which it is the legal duty of a public utility to furnish, a service in which the complainant citizens and the city are sharing.

Affirmed.

ANDERSON, C. J., and GARDNER, and FOSTER, JJ., concur.