On Application for Rehearing
The opinion of April 12, 1996, is withdrawn and the following opinion is substituted therefor.
The Talladega City Board of Education ("the Board") and Jerry Yancy appeal and cross appeal, respectively, from a judgment awarding Yancy $11,892.68 in Yancy's action against the Board alleging wrongful termination of employment. We affirm.
The evidence would support the following statement of the facts. In the summer of 1991, Yancy, a certified teacher with approximately 10 years' experience at secondary educational institutions, sought employment with a number of Alabama school systems, including the Barbour County, Houston County, and City of Talladega systems. With regard to the City of Talladega system, he telephoned Rick Armstrong, who was the head football coach at Talladega High School. As a result of their telephone conversation, Yancy and Armstrong met in August at the Alabama High School Athletic Association's "annual coaches' convention." Subsequently, Yancy telephoned Charles Kearley, the Talladega High School principal, and scheduled an interview with him.
During the interview, Kearley told Yancy that the Talladega City Board of Education was scheduled to meet that day — August 15, 1991 — and asked whether Yancy had already completed application forms and submitted them to the Board. Yancy said that he had not yet done so. Immediately after the interview, Yancy completed and submitted formal application materials.
Three days later, Armstrong telephoned Yancy and told him: "You got the job over here." More specifically, Armstrong told Yancy that he was relaying this message from Kearley and that Kearley was merely relaying the message from Dr. Edison Barney, superintendent of the Talladega City Board of Education. Also included in this message were instructions to Yancy to report to Talladega High School the next morning to participate in a "teachers' institute day."[1]
Present at the teachers' institute meeting were Dr. Barney, the school principals, "all the teachers in the . . . city system," and a member of the Board. To those attending the meeting, Kearley introduced Yancy, who stood before the attendees while Kearley described *Page 35 
him to the group "as the new driver's education teacher and coach." Later that day, Dr. Barney and Yancy formally met. Yancy described the initial meeting as follows:
 "I introduced myself to him and he told me he was glad I was there, was glad that he could hire me[;] that they couldn't find anybody else for certified driver's education because it was so late in the year. He said, 'I'm glad you are here. You are new and I am new. We can start together. Welcome to Talladega High School.' "
Also that day, Yancy was assigned a "homeroom" and received a set of keys and a "roll book."
Regular classes began the next day, Tuesday, August 20, and on that day Yancy reported for work. While Yancy was teaching school that day, his wife received telephone calls at home from the superintendents of the Barbour County and Houston County school systems, inquiring whether Yancy was still available for a teaching position. To both superintendents, his wife replied that he had accepted employment with the City of Talladega system, at Talladega High School.
Meanwhile, on the afternoon of August 19 or the morning of August 20, the following events occurred, according to Kearley's testimony:
 "I was in the superintendent's office . . . [t]alking with the superintendent, and the bookkeeper brought it to his attention that the State had reduced our funding by $18,000.00 for driver's education. And at that point, he informed me that we would not be able [to] employ a second driver's [education] teacher. The reason for that [was that] we had 1.65 funding and with that reduction it would cut it down to where we could not afford to have two."
Midway through Friday morning of that week, Kearley met with Yancy and told him that his position had been eliminated. Yancy then returned his keys and roll book, and the school enlisted a substitute teacher to handle his classes for the rest of the day.
Approximately three months later, Yancy obtained a teaching position in the Choctaw County school system. However, the three-month salary interruption caused the Yancys considerable financial difficulty, and, on February 21, 1992, Yancy sued the Talladega City Board of Education. He alleged that the Board had terminated his employment contrary to the provisions of the Teacher Tenure Act, Ala. Code 1975, §§ 16-24-1 to-13, and he sought a judgment (1) reinstating him with back pay, or, in the alternative, (2) awarding him $33,500, the amount of his anticipated annual salary, plus interest, attorney fees, and costs. Following a nonjury trial, the Talladega County Circuit Court — citing the doctrine of equitable estoppel — awarded Yancy $10,177.80, plus $1,714.88 interest.
In Case No. 1940131, the Board appeals the judgment in favor of Yancy. In Case No. 1940226, Yancy cross appeals, contesting the amount of the award.[2] We shall address the cases in that order.
 I. Case No. 1940131
The Board contends that it never employed Yancy and, therefore, that he could have no valid claim against it for wrongful termination. In support of this argument, it quotes Ala. Code 1975, § 16-12-16, which provides in pertinent part:
 "The city superintendent of schools shall nominate in writing for appointment by the city board of education all principals, teachers, supervisors, attendance officers, janitors and all other employees of the board and shall assign to them their positions, transfer them as the needs of the schools require, recommend them for promotion, suspend them for cause and recommend them for dismissal, subject to the provisions of Chapter 24 of this title."
(Emphasis added.) The Board states: "It was undisputed at trial that at no time was Yancy nominated to the City Board in writing or otherwise for employment." Brief for AppellantTalladega City Board of Education, at 19 (emphasis added). The Board also contends that it "never appointed Yancy for employment." Id. Because these two statutory provisions were not met, the Board *Page 36 
insists, its actions and those of the superintendent could not form the basis of an enforceable employment contract.
Yancy argues that the facts of this case warrant the application of the doctrine of equitable estoppel. More specifically, he contends, the Board should be "estopped from asserting the failure of the Superintendent to nominate [Yancy formally] for the position." Brief of Appellee, at 30.
This Court discussed the doctrine of equitable estoppel inMazer v. Jackson Insurance Agency, 340 So.2d 770 (Ala. 1976), stating:
 "The purpose of [the doctrine of] equitable estoppel . . . is to promote equity and justice in an individual case by preventing a party from asserting rights under a general technical rule of law when his own conduct renders the assertion of such rights contrary to equity and good conscience. First National Bank of Opp v. Boles, 231 Ala. 473, 479, 165 So. 586, 592 (1936).
"Equitable estoppel is
 " ' ". . . based upon the ground of public policy and good faith, and is interposed to prevent injustice and to guard against fraud by denying to a person the right to repudiate his acts, admissions, or representations, when they have been relied on by persons to whom they were directed and whose conduct they were intended to and did influence. The doctrine of estoppel is far reaching in its effect, extending to real as well as personal estate, and embracing almost every enterprise in which men may be engaged." [Emphasis added in Mazer.]'
"Id., quoting 21 C.J.S. § 120, pp. 1117-18.
". . . .
"The basic elements of equitable estoppel are stated in Dobbs, Remedies § 2.3 (1973):
 " 'An estoppel . . . has three important elements. The actor, who usually must have knowledge of the true facts, communicates something in a misleading way, either by words, conduct or silence. The other relies upon that communication. And the other would be harmed materially if the actor is later permitted to assert any claim inconsistent with his earlier conduct.'
"A more detailed statement of the elements generally required to support an estoppel is given in 3 Pomeroy, Equity Jurisprudence § 805 (5th ed. 1941):
 " '. . . 1. There must be conduct — acts, language, or silence — amounting to a representation or a concealment of material facts. 2. These facts must be known to the party estopped at the time of his said conduct, or at least the circumstances must be such that knowledge of them is necessarily imputed to him. 3. The truth concerning these facts must be unknown to the other party claiming the benefit of the estoppel, at the time when such conduct was done, and at the time when it was acted upon by him. 4. The conduct must be done with the intention, or at least with the expectation, that it will be acted upon by the other party, or under such circumstances that it is both natural and probable that it will be so acted upon. . . . 5. The conduct must be relied upon by the other party, and, thus relying, he must be led to act upon it. 6. He must in fact act upon it in such a manner as to change his position for the worse; in other words, he must so act that he would suffer a loss if he were compelled to surrender or forgo or alter what he has done by reason of the first party being permitted to repudiate his conduct and to assert rights inconsistent with it. . . .' "
340 So.2d at 772-73 (some emphasis omitted).
Although the doctrine of equitable estoppel is onlyinfrequently applied against a municipality or other governmental entity, Marsh v. Birmingham Board of Education,349 So.2d 34, 36 (Ala. 1977), it will "apply against a municipal corporation when justice and fair play demand it." City ofGuntersville v. Alred, 495 So.2d 566, 568 (Ala. 1986). See Exparte Mathers, 541 So.2d 1110 (Ala. 1989); Alford v. City ofGadsden, 349 So.2d 1132 (Ala. 1977); City of Montgomery v.Weldon, 280 Ala. 463, 195 So.2d 110 (1967); Brown v. TuskegeeLight Power Co., *Page 37 232 Ala. 361, 168 So. 159 (1936); see also Kohen v. Board of SchoolCommissioners of Mobile County, 510 So.2d 216 (Ala. 1987); Exparte Four Seasons, Ltd., 450 So.2d 110 (Ala. 1984). In other words, " '[t]he defense of equitable estoppel may be asserted against a municipal corporation when the character of the action and the facts and circumstances are such that justice and equity demand that the corporation should be estopped.' Dillon on Municipal Corporations (4th Ed.) 675." Brown,232 Ala. at 367, 168 So. at 165. The application of the doctrine to governmental entities is in accord with the principle that " ' "[t]he state, in all its contracts and dealings withindividuals, must be adjudged and abide by the rules which govern in determining the rights of private citizens contracting and dealing with each other." ' " 232 Ala. at 367,168 So. at 165 (emphasis added).
Indeed, this Court recognizes only two specific instances in which a municipality cannot be estopped. The first instance is one in which the municipality "question[s] the legality of a contract into which it had no authority to enter." Alford v.City of Gadsden, 349 So.2d 1132, 1135 (Ala. 1977) (emphasis added). The second instance is one in which the municipality seeks to avoid doing "that which it has no authority to do."Id. (emphasis added); see also City of Guntersville v. Alred,495 So.2d 566, 568 (Ala. 1986). The sine qua non of the inapplicability of the estoppel doctrine in both instances is the absence of general authority in the municipality to do that which would result from the application of the doctrine. Thus, where it has the authority to enter a particular contract, "a city can be estopped to deny a contract [— even one] into which it did not legally enter." 495 So.2d at 568 (emphasis added).
City of Guntersville illustrates this principle. In that case, Robert Hembree, as mayor of the City of Guntersville, executed an agreement with A.M. Alred, Jr., and others, for the 25-year lease of real estate owned by the City of Guntersville. 495 So.2d at 567. The lease was executed after negotiations and discussions regarding the agreement in a series of city council meetings, but without the adoption of a city ordinance authorizing the lease, as required by Ala. Code 1975, §11-47-21. 495 So.2d at 567. Section 11-47-21 provides in pertinent part:
 "The governing body of any city or town in this state may, by ordinance to be entered on its minutes, lease any of its real property not needed for public or municipal purposes, and a lease made by the mayor in accordance with such ordinance
shall be binding for the term specified in the lease, not to exceed a period of 99 years. . . ."
(Emphasis added.)
Several years later, after Alred had "expended substantial sums of money to obtain the property and [had made] improvements on it," a dispute arose over the terms of the lease. 495 So.2d at 567. The City of Guntersville sued Alred, seeking a judgment declaring the lease invalid on the ground that the transaction had not been authorized by an ordinance. The trial court held that the City of Guntersville was estopped to deny the validity of the agreement. Id. The City of Guntersville appealed, contending that estoppel should not apply "because [it] did not have the authority to enter into a lease . . . and, therefore, . . . [that] the lease should be held void ab initio." Id.
This Court rejected that contention and affirmed the judgment of the trial court. It noted that § 11-47-21 provided municipalities general authority to lease property.
495 So.2d at 568. Citing Alford, it held that where the City of Guntersville had entered into a contract pursuant to general statutory authority, the failure to satisfy the formal adoption requirement of § 11-47-21 did not prevent the application of the doctrine of estoppel to the City of Guntersville's defense, namely, that the contract had not been legally executed.
The Board says there are two unfulfilled conditions precedent to the establishment of an enforceable employment contract: (1) Dr. Barney's submitting to the Board a written nomination of Yancy, and (2) some affirmative action on the nomination by the Board. The Board clearly possessed the statutory authority to employ Yancy. See § 16-12-16, Ala. Code 1975, supra; see also §16-11-9 ("city board of education is . . . vested with *Page 38 
all the powers necessary or proper for the administration and management of the free public schools within such city"); §16-11-17 ("city board of education shall fix the salaries of all employees and may suspend or dismiss any principal or teacher or supervisor . . . so appointed on the written recommendation of the city superintendent of schools"). Thus, if the elements of the doctrine of equitable estoppel are satisfied by the facts in this case, the two missing requirements on which the Board relies do not preclude its application.
Applying the six elements of estoppel set forth above, we conclude that the Board — by itself and through its superintendent, Dr.Barney — engaged in conduct that concealed a material fact and that was calculated to induce Yancy to change his position in reliance on the facts as he mistakenly thought them to be. We also conclude that the evidence supports the finding that Yancy, in reliance on the Board's conduct, did change his position, to his detriment.
The Board's most significant conduct occurred on August 19, 1991, during, and after, the teachers' institute meeting. A Board member was present at that meeting when Kearley publicly introduced Yancy as "the new driver's education teacher and coach." From all that appears of record, the introduction elicited nothing from that Board member, or from Dr. Barney, who was also present, that Yancy could construe as an objection to Kearley's statements. The Board member's silence at Yancy's introduction — which reasonably could be construed as an offer of employment — can best be characterized as acquiescence orratification. This characterization is particularly significant in view of the fact that the statutory scheme does not require the Board to solemnize its employment decisions in any particular or formal manner. Moreover, the record is devoid of evidence that the Board member present at the meeting was present in any capacity other than as an agent or representative of the Board, or that the Board took any steps calculated to indicate its nonacquiescence within a reasonable time after the introduction. We disagree, therefore, with the Board's contention that it "never appointed Yancy for employment." Brief for Appellant, Talladega City Board ofEducation, at 19. The "material fact" concealed as of the time Yancy was introduced as "the new driver's education teacher and coach" — without a contemporaneous or timely objection by anyone on the Board — was that Dr. Barney had not submitted awritten recommendation.
Equally misleading was Dr. Barney's conduct after the meeting, when he told Yancy: "I'm glad you are here. You are new and I am new. We can start together. Welcome to Talladega High School." Dr. Barney's statements served to reinforce the reasonable inference Yancy could have already drawn — that Dr. Barney had satisfied all the formalities for which he was responsible. Thus, we hold that the Board is estopped to assert — as a condition precedent to the validity of Yancy's contract, which it had the authority to execute and the opportunity to disavow while other employment opportunities were still available to Yancy — Dr. Barney's compliance with §16-12-16.[3] The evidence indicates that while the Board was leading Yancy to think all formalities had been complied with, the Board, and (as between these parties) only the Board, knew that the formalities had not been complied with. The doctrine of equitable estoppel is, therefore, applicable in this case.
 II. Case No. 1940226
Yancy contends that the trial court erred in awarding him only $11,892.68. That was the amount (with interest) that would have accrued to Yancy under his contract with the City of Talladega system from the time he left Talladega High School until he began working for the Choctaw County school system. Yancy contends that in so limiting the award, the trial court "applied a form of the doctrine of mitigation of damages."Brief of the Appellee, at 31. It erred in applying this doctrine, Yancy argues, because, *Page 39 
he argues: "An Alabama public school teacher who has been wrongfully terminated has the right to be reinstated from the date of his wrongful termination, with full back pay and all benefits denied him as a result of his wrongful termination."Id.
In support of this argument, he cites the following three cases: Barger v. Jefferson County Board of Education,372 So.2d 307 (Ala. 1979); Madison County Board of Education v. Wigley,288 Ala. 202, 259 So.2d 233 (1972); and Debrow v. Alabama StateTenure Comm'n, 474 So.2d 99 (Ala.Civ.App. 1984), writ quashed,474 So.2d 101 (Ala. 1985). To be sure, the Barger Court stated:
 "The Court addressing this issue in Madison County Board of Education v. Wigley . . . held that where a teacher is improperly discharged, he is entitled to back salary from the date of his last salary payment, stating:
 " 'The doctrine of mitigation of damages [applicable] in ordinary contracts is contrary to the Teacher Tenure statutes.' "
372 So.2d at 309. This Court also recognizes, however, that "[t]he Alabama Legislature, by enacting the Teacher Tenure Law, has created two classes of teachers in the public schools of this state, those [who] have a continuing service status (tenured teachers) and those [who] do not . . . (probationary or nontenured teachers)." Foster v. Blount County Board ofEducation, 340 So.2d 751, 752 (Ala. 1976) (emphasis added). "Through the passage of [the tenure laws] the legislature intended to provide tenured teachers with a measure of security and permanence in their employment." Ex parte Jackson,625 So.2d 425, 428-29 (Ala. 1992) (emphasis added). Otherwise stated, the obvious intent of the legislature in creating this two-tiered system was to deny the nontenured teacher "the full panoply of rights enjoyed by the tenured teacher." Ex parteHayes, 405 So.2d 366, 371 (Ala. 1981).
Barger and Wigley both involved wrongful termination actions by tenured teachers, and Debrow involved no issue of mitigation of damages. Consequently, those cases do not support Yancy's argument that the Teacher Tenure Act has abrogated the traditional contract principle of mitigation of damages. In short, Yancy has cited no case in which this Court has extended the rule expressed in Barger and Wigley to nontenured teachers, and we decline to do so in this case.
Yancy has shown no error, therefore, in the court's awarding damages based only on the period during which he was unemployed after leaving Talladega High School.
The judgment is affirmed, both as to the appeal and as to the cross appeal.[4]
1940131 — OPINION WITHDRAWN; OPINION SUBSTITUTED; APPLICATION OVERRULED; AFFIRMED.
1940226 — OPINION WITHDRAWN; OPINION SUBSTITUTED; APPLICATION OVERRULED; AFFIRMED.
HOOPER, C.J., and SHORES, HOUSTON, and BUTTS, JJ., concur.
MADDOX, J., dissents.
[1] Additionally, in consequence of his anticipated employment and pursuant to instructions from Talladega High School officials or personnel, Yancy took steps to relocate his family to the Talladega area. These steps included renting a home and enrolling his two children in an area school.
[2] The Alabama Association of School Boards filed briefs asamicus curiae.
[3] Marsh v. Birmingham Board of Education, 349 So.2d 34
(Ala. 1977), and Branch v. Greene County Board of Education,533 So.2d 248 (Ala.Civ.App. 1988), two cases on which the Board principally relies, are inapposite. Neither of those cases involved facts that could be construed as indicating the board of education's acquiescence in, or ratification of, an offer of employment.
[4] The parties and the amicus curiae advanced arguments in addition to those discussed in this opinion. We considered them and found them to be without merit.