The sole issue in this case is whether the trial court erred in not granting the defendant's motion for a new trial, on the grounds that the jury awarded verdicts for the plaintiff both on her breach of contract claim and on her fraud claim. The defendant argues that these verdicts were inconsistent because both claims arose out of the same transaction.
The plaintiff, Charlotte Jackson, applied for a life insurance policy on June 12, 1989, with Jean McKnight, agent for the defendant, Liberty National Life Insurance Company ("Liberty National"). The insured under the policy was Mrs. Jackson's husband, James Carroll Jackson. Mrs. Jackson was listed as the beneficiary under the policy. The policy was issued in the amount of $100,000 and had an effective date of September 8, 1989. The premium payments were $101.76 per quarter; however, Mrs. McKnight agreed that Mrs. Jackson could make monthly payments in the sum of $37.99. Mrs. Jackson made an initial premium payment of $37.99 when the application was submitted on June 12, 1989. The facts from this point forward are, for the most part, disputed.
Mrs. Jackson testified that she made the next two premium payments in either September and October or October and November, respectively, of 1989. Mrs. McKnight testified that the balance of the $101.76 quarterly premiums was paid in early December 1989, and that she delivered the policy to Mrs. Jackson several days later. Mrs. Jackson claims that the policy was not delivered to her until January 1990.
In any event, on January 9, 1990, Liberty National sent a notice to Mr. Jackson stating that "the grace period for payment of the premium due on the date shown [December 8, 1989] has expired and your insurance has terminated." The notice, however, provided a late payment offer by which Mrs. Jackson could revive the policy if payment was made within 50 days of the due date.
Mrs. Jackson testified that, upon receiving the notice, she called Mrs. McKnight, who, she said, responded, "[w]hat are you so worried about? You know, you still have a computer printout. Don't worry, I'll be over there in a little bit." Mrs. Jackson testified that she understood this to mean that her insurance policy was still in force. Mrs. McKnight came to Mrs. Jackson's house the same day, and Mrs. Jackson testified that, based on the statements made to her by Mrs. McKnight, she paid the amount of $33.92 and received a receipt from Mrs. McKnight which read "paid $33.92 for December premium, 1-16-90." Mrs. Jackson testified that Mrs. McKnight told her that she had to pay only one third of the $101.76 quarterly premium at that time and that she would come by later to pick up the unpaid balance.
Mrs. McKnight disputed this account of the facts. She testified that she visited Mrs. Jackson on January 16 after receiving a listing of her delinquent accounts. Mrs. McKnight further testified that she told Mrs. Jackson that her account was delinquent and that she would need to pay $101.76 in order to reactivate the policy. Mrs. McKnight claimed that Mrs. Jackson told her that the Jacksons could pay only one third of this amount but that they would try to pay the balance over the next week. Mrs. McKnight testified that neither Mr. Jackson nor Mrs. Jackson made any further payments on the quarterly premium after January 16, 1990.
Mrs. Jackson testified that between January 16, 1990, and April 11, 1990, she was never advised by Mrs. McKnight or anyone else from Liberty National that her husband's *Page 1007 
insurance policy had lapsed. Mrs. Jackson also testified that she talked with Mrs. McKnight again in March 1990 and at that time asked her when she was going to come by to collect the remaining premium payments.
Mrs. McKnight testified that she reminded Mrs. Jackson on several occasions after January 16, 1990, that the remaining premiums had not been paid and that Mrs. Jackson told her that she and her husband could not pay them. Mrs. McKnight also stated that she told Mr. Jackson sometime after March 8, 1990, that the policy was "out of benefit" and that the remaining balance had to be paid, but that he told her he was unable to make any payments. Mr. Jackson died on April 11, 1990.
Mrs. Jackson testified that she never talked to Mrs. McKnight after her husband's death. Mrs. McKnight testified that Mrs. Jackson called her the day after her husband's death to inquire about the insurance policy, and that she told Mrs. Jackson she was sorry to hear about her husband's death, but that the policy had lapsed due to nonpayment of premiums.
On April 18, 1990, Mrs. Jackson's attorney wrote Liberty National regarding Mr. Jackson's life insurance policy. In its reply letter dated April 23, 1990, Liberty National stated that Mr. Jackson's policy had lapsed due to nonpayment of premiums on January 25, 1990. Mrs. Jackson's attorney wrote Liberty National again, this time to inquire about the payments made by Mr. Jackson under his policy. Liberty National replied by letter dated November 12, 1990:
 "This policy was issued September 8, 1989 with one premium remittance at the issue paying the policy to 12/8/89. Since that time there have not been any more premiums paid on this policy."
As evidenced by this letter, the payment of $33.92 which Mrs. Jackson made to Mrs. McKnight on January 16, 1990, was never applied to Mr. Jackson's policy. Rather, the money was placed in an "open account" at Liberty National. Mrs. McKnight testified that an "[o]pen account is an account in which we put money in when we don't have the full premium on the policy. We have to put it in this account until we get the full balance of the premium."
Mrs. Jackson claims that Mrs. McKnight intentionally failed to apply her January 16, 1990, payment to her husband's policy, with the intent to defraud Mrs. Jackson. She claims that Liberty National suppressed the fact that the $33.92 payment was never applied to the policy, and that as a result, her husband's policy lapsed. Mrs. Jackson sued Liberty National, alleging breach of contract, misrepresentation, and bad faith. The trial court directed a verdict for Liberty National on the bad faith claim.
After a trial, the jury returned a verdict in favor of Mrs. Jackson on both her breach of contract claim and her fraud claim, awarding her compensatory damages of $100,000 on her contract claim and $50,000 on her fraud claim, and awarding her punitive damages of $50,000.
Liberty National timely moved for a judgment notwithstanding the verdict or, in the alternative, for a new trial, stating as grounds that the jury had rendered inconsistent verdicts on the breach of contract and fraud claims. In its motion, Liberty National requested an opportunity to present oral argument in support of its motion, pursuant to Ala.R.Civ.P. 59(g). The trial court denied Liberty National's motion without a hearing.
We now address the question whether the trial court erred in not granting a new trial on the grounds that the jury's verdicts in favor of Mrs. Jackson on both the breach of contract claim and the fraud claim were inconsistent.
It is well settled under Alabama law that a plaintiff may present alternative, inconsistent, and mutually exclusive claims to the jury. King v. Cooper Green Hospital,591 So.2d 464, 465-66 (Ala. 1991). However, the plaintiff may recover under only one of these claims. United States Fidelity Guaranty Co. v. McKinnon, 356 So.2d 600, 607 (Ala. 1978).
In McKinnon, the plaintiff sued the insurance company for denying her claim under an uninsured motorist provision of *Page 1008 
an automobile liability insurance policy issued to her mother. The insurer denied that the plaintiff was covered under the policy, arguing that she did not fit within the policy's definition of "insured," i.e., a "relative of the Named Insured who is a resident of the same household." However, the evidence showed that the employee of the insurance agency with whom the plaintiff's mother had dealt was aware that the plaintiff no longer lived with her mother but nevertheless assured the plaintiff's mother that the plaintiff would be covered under the policy. The plaintiff proceeded against the insurance company on theories of both breach of contract and fraudulent misrepresentation. The breach of contract claim was based on the company's failure to pay under the policy for damages incurred as a result of the negligence of an uninsured motorist. The fraud claim was based on the company's representations to the plaintiff's mother, which the plaintiff relied on to her detriment, that the plaintiff was covered under the policy, when she in fact was not.
Both counts were submitted to the jury, and the jury returned a general verdict of $55,000. Finding that the verdict was self-contradictory, this Court stated:
 "May damages be recovered for breach of an existing contract and at the same time recover damages for fraud for [the defendant's] representing there was a contract when, in fact, there was none? We think not. The theories of recovery are factually inconsistent; therefore, the general verdict of the jury in this case is self-contradictory. It had the effect of finding both that there was a contract and that there was not."
356 So.2d at 607.
In National Security Fire Casualty Co. v. Vintson,414 So.2d 49 (Ala. 1982), the plaintiff sued the insurance company for its failure to pay benefits under a fire insurance policy. The plaintiff stated that on June 18, 1980, the insurer's agent came to his mobile home and filled out an application for fire insurance on the plaintiff's mobile home and that at that time the plaintiff paid the initial premium. The plaintiff testified that the agent assured him that "he had fire insurance coverage from that point in time and that, as long as he had his premium receipt, it was as good as his policy." On June 22, 1980, the plaintiff's mobile home burned. The plaintiff contacted the office superintendent to inform her about the loss of the mobile home. She advised him that "she doubted that [the insurer] would provide coverage because the application had only been received by [the insurer], and no policy had been issued." The insurer subsequently denied coverage under the policy and refunded the plaintiff's premium.
The plaintiff sued the insurer, alleging breach of contract in one count and fraud and misrepresentation in the other. The jury awarded $20,000 on the breach of contract claim and $15,000 on the fraud claim. In holding that the plaintiff could not recover on both counts, this Court explained:
 "There are a number of situations in our law whereby a plaintiff may derive benefits from a contract and yet still recover for tortious action concerning the contract, such as misrepresentation and deceit. There is a line of cases wherein the facts show misrepresentations concerning the goods that the buyer purchases; e.g., a buyer purchases a horse that the seller maintains has two good eyes, and the buyer later discovers that one of the eyes is blind. In this type of situation, the buyer need not forgo the benefit received under the contract in order to sue for the misrepresentations. [Citations omitted.]
 "Analogous are the cases involving an allegation of bad faith failure to pay insurance benefits wherein a factual situation may reveal an insurance agent's misrepresentations to a buyer that an insurance policy will cover a buyer regardless of a particular medical history that usually would preclude coverage. If the insurance company later refuses to pay, that case may lend itself to allow the buyer to recover not only under the contract itself, but also for the tortious bad faith refusal to pay under the policy. [Citations omitted.] *Page 1009 
 "In the above factual situations where benefit is obtained not only for tortious conduct but also under the contract itself, the existence of the contract was not disputed. Such is not the case here.
 "We hold that in the narrow situation, such as the one in this case, where the plaintiff claims misrepresentation in the inception of the contract, i.e., where the agent misrepresents the moment in time that the policy will take effect, the plaintiff has the right to present his case to the jury under either a breach of contract theory or the tort of misrepresentation [theory,] or both, because the same facts could support a finding that the contract did exist, even though the agent misrepresented the time of its inception."
414 So.2d at 50, 51.
Mrs. Jackson claims that Deupree v. Butner, 522 So.2d 242
(Ala. 1988), is controlling in this case. In Deupree, the defendant sold to the Butners a townhome. The sales contract provided for a "boat slip" to be built and for its price to be included in the price of the townhome. When the seller applied for a permit from the Florida Department of Natural Resources ("DNR") to build boat slips for the townhomes he was selling, several objections were filed and a hearing was scheduled. Meanwhile, the seller asked DNR that his application be put "on hold"; however, he continued building the boat slips. When questioned by DNR, the seller told DNR that the boat slips were being built by the individual owners of the townhomes themselves. He told the Butners, however, that there would be no problem in getting permission to build the slips. The Butners testified that they had already closed on the contract to purchase the townhome when they realized that the seller could not provide the boat slip he had promised.
The Butners sued the seller, alleging breach of contract and fraud. The jury awarded $20,000 on the contract claim and $59,001 on the fraud claim ($1 nominal damages and $59,000 in punitive damages).
The defendant argued on appeal that the plaintiffs should not have been allowed to recover for both fraud and breach of contract because both claims arose from the same transaction and, in effect, the plaintiffs would be allowed a double recovery. This Court, holding that such a transaction could support an award of damages for both breach of contract and fraud, distinguished McKinnon:
 "In McKinnon, the fraud that was alleged was a representation that a contract existed when one did not. To make a determination of fraud in that case, the jury had to find that no contract existed; on the contrary, if the jury found that there was a contract, and a breach, then the jury had to find necessarily that there had been no fraud in the defendant's representation that a contract existed. In other words, the jury could not consistently have found that there was liability on both claims. The fraud alleged in this case does not involve a representation about the existence of a contract between [the defendant] and the [the plaintiffs], but the question whether [the defendant] concealed certain facts regarding the difficulty or impossibility of obtaining the necessary submerged land leases for the boat slips.
 ". . . We hold that the fraud alleged in this case was not fraud in the inception of the contract, but in fraudulent concealments after the contract was made, and that the facts of this case could support both a breach of contract claim and a fraud claim."
522 So.2d at 244.
Unlike the misrepresentation in Deupree, the alleged misrepresentations that form the basis of Mrs. Jackson's fraud claim regard the existence of a contract. Mrs. Jackson's fraud claim is based on a conversation that she says she had with Mrs. McKnight on January 16, 1990, in which Mrs. McKnight allegedly represented to Mrs. Jackson that her husband's life insurance policy was in force when, in fact, it was not. To find in favor of Mrs. Jackson on the fraud count, the jury necessarily found that the policy was not in force at that time. However, to find in favor of Mrs. Jackson on the breach of contract count, the jury necessarily had to find that *Page 1010 
the policy was in force at the time of her husband's death. These findings are factually inconsistent. Like the jury verdict in McKinnon, the jury verdict in this case "had the effect of finding both that there was a contract and that there was not." 356 So.2d at 607.
The trial court erred in not granting Liberty National's motion for a new trial. Its judgment is, therefore, reversed, and the cause is remanded.
REVERSED AND REMANDED.
HORNSBY, C.J., and ALMON, ADAMS and STEAGALL, JJ., concur.