679 So.2d 1052 (1996)
Willie E. SHEFFIELD
v.
Lillian P. ANDREWS and Minnie May Pugh.
1941693.
Supreme Court of Alabama.
April 12, 1996.
Rehearing Overruled July 19, 1996.
Opinions Dissenting from Overruling of Rehearing July 19, 1996.
Edward P. Turner, Jr. and Halron W. Turner of Turner, Onderdonk, Kimbrough & Howell, P.A., Chatom, for appellant.
Wyman O. Gilmore, Jr. and Lamar C. Johnson of Gilmore Law Office, Grove Hill, for appellees.
COOK, Justice.
Willie E. Sheffield appeals from a judgment awarding Lillian P. Andrews, individually, and as attorney in fact for her sister, Minnie May Pugh, who is incapacitated, $10 in compensatory damages and $1,000,000 in punitive damages on Andrews's claim that Sheffield and Andrews's former attorney, James Tucker, were part of a conspiracy to defraud her and her sister out of their property. Andrews, who was 91 years old at the time, alleges that Sheffield paid Tucker $15,000 to obtain title to property owned by Ms. Andrews and her sister and that Tucker did so by misrepresenting to Ms. Andrews, who had poor eyesight, the content of certain documents signed by her. Those documents purported to transfer Andrews's property interest to Sheffield. After Andrews signed the documents, she cut timber on the property twice and executed a hunting lease on the property. Tucker, in an attempt to stop the timber cuttings, informed Andrews that she would have tax problems if she continued to cut timber; Sheffield attempted to circumvent the hunting lease by offering to purchase it from the lessee for $10,000.
*1053 In addition, Tucker, unknown to Andrews, added to a will he prepared for Andrews language stating that upon Andrews's death, the property, valued at well over $1,000,000, would be sold to Sheffield for $250,000 or $500,000, depending on the interest owned by Ms. Andrews. The price was dependent on whether Andrews, at the time of her death, had inherited the interest of her sister, Ms. Pugh. Sheffield, thereafter, deposited $428,000 with Tucker for payment to Andrews's estate upon her death. Tucker put $400,000 in a certificate of deposit in trust for Sheffield and apparently spent the remaining $28,000. Andrews did not know about the money and never received any benefit therefrom. Upon learning that Sheffield claimed title to her property based on the documents signed by her, Andrews sued, seeking to quiet title to the property and seeking damages, alleging that Sheffield and Tucker were guilty of fraud.
The jury returned a verdict of $10 in compensatory damages and $2,000,000 in punitive damages. Following a Hammond hearing, the trial court reduced the punitive damages award to $1,000,000. On appeal, Sheffield contends that Andrews should not have been permitted to "rescind" the alleged contract and at the same time collect punitive damages for fraud. He claims that these remedies are inconsistent and that Andrews should be forced either to rescind the agreement and collect no punitive damages or to affirm the contract and be allowed to seek punitive damages. He further argues that the verdict should have been reduced by significantly more than $1,000,000, because, he argues, his net worth is only $720,000. We disagree with each of Sheffield's contentions and affirm the judgment of the trial court.
"It is well settled under Alabama law that a plaintiff may present alternative, inconsistent, and mutually exclusive claims to the jury. King v. Cooper Green Hospital, 591 So.2d 464, 465-66 (Ala.1991). However, the plaintiff may recover under only one of these claims. United States Fidelity & Guaranty Co. v. McKinnon, 356 So.2d 600, 607 (Ala.1978)."
Liberty National Life Insurance Co. v. Jackson, 603 So.2d 1005, 1007 (Ala.1992). The question here is whether the remedies in this case are, in fact, inconsistent, as argued by Sheffield; in other words, we must decide whether Andrews can collect damages for fraud and rescind the real estate conveyance. For the following reasons, we conclude that these remedies are not inconsistent.
In Mid-State Homes, Inc. v. Johnson, 294 Ala. 59, 66, 311 So.2d 312, 318 (1975), this Court held that "where one rescinds a contract induced by fraud and recovers even nominal damages, then in an appropriate case he may also recover punitive damages." The Court, quoting with approval Ward v. Taggart, 51 Cal.2d 736, 336 P.2d 534 (1959), stated:
"`Courts award exemplary damages to discourage oppression, fraud, or malice by punishing the wrongdoer.... Such damages are appropriate in cases... where restitution would have little or no deterrent effect, for wrongdoers would run no risk of liability to their victims beyond that of returning what they wrongfully obtained....'
"We agree with this reasoning. Punitive damages are for punishment and prevention. To allow them when a contract is affirmed, and not when there is a rescission, is illogical when the purposes of punitive damages are considered. The punitive and deterrent force of the law should be present in both types of cases since both arise from perpetration of fraud."
Mid-State Homes, Inc. v. Johnson, 294 Ala. at 66, 311 So.2d at 318. Andrews contends that the facts of this case bring it within the holding in Mid-State, supra. In particular, she argues that forcing her to elect between remedies would, in effect, allow Sheffield to perpetrate fraud and "`run no risk of liability to [his victim, Andrews] beyond that of returning what [he had] wrongfully obtained.'" Mid-State Homes, Inc. v. Johnson, 294 Ala. at 66, 311 So.2d at 318, quoting Ward v. Taggart, 51 Cal.2d 736, 336 P.2d 534.
The documents purporting to transfer the property from Andrews to Sheffield were void because of the fraud of Sheffield and Tucker. See Cumberland Capital Corp. *1054 v. Robinette, 57 Ala.App. 697, 331 So.2d 709 (1976), wherein the court stated:
"[I]t is apparent from the record that the signatures of the grantors ... were placed upon the deeds either by forgery or by the grantors' having been deceived into signing the instruments in ignorance of their true character. A signature procured by this character of fraud is considered forged under Alabama law. Warren v. State, 247 Ala. 595, 25 So.2d 698. See also 11 A.L.R.3d 1076. A forged deed is void, and completely ineffectual to pass title. 23 Am.Jur.2d Deeds §§ 137, 139, and cases cited thereunder.
"Even if the signatures are not forged, or considered as such under the rule enunciated in the Warren case, supra, a deed is nonetheless absolutely void where the grantor's signature is obtained by fraud going to the nature of the instrument he was requested to sign. Gamble v. Moore, 278 Ala. 104, 176 So.2d 35; 23 Am.Jur.2d Deeds § 142, and cases cited thereunder."
331 So.2d at 713. In finding for Andrews on the fraud count, the jury determined that because of Sheffield and Tucker's fraud, there was no agreement between Andrews and Sheffield for the purchase of her property. Thus, the remedy of voiding the "agreements" is not inconsistent with an award of punitive damages for the fraud perpetrated by Sheffield on Andrews.
Finally, Sheffield contends that the trial court should have remitted the punitive damages award by more than $1,000,000 because, he claims, his estate in not large enough to pay such a significant verdict. Should he be required to do so, he claims, he will be financially destroyed. The trial judge, in his order remitting the verdict by $1,000,000, stated:
"This matter came for a hearing on the defendant Willie E. Sheffield's motion for a new trial, or in the alternative motion for judgment NOV, filed after the entry of judgment on the jury's verdict of $2,000,010.00. The defendant James A. Tucker, Jr., filed no post-judgment motion. A hearing was conducted on May 22, 1995....
". . . .
"The court finds and determines that there was clear and convincing evidence justifying the award of punitive damages in this case. The court considered extensive testimony touching on the factors enunciated in Hammond v. City of Gadsden, 539 So.2d 218 [493 So.2d 1374] (Ala.1986), and Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala.1989). It now sets forth its analysis of each factor.
"A. REASONABLE RELATIONSHIP TO THE HARM THAT HAS ACTUALLY OCCURRED AND THE HARM THAT IS LIKELY TO OCCUR. The court concludes from the evidence that the harm caused by the defendants' conspiracy was grievous. The fraudulent scheme, had the plaintiff died, would have transferred the bulk of each estate to the defendant Sheffield, depriving charitable entities of substantial assets.
"B. REPREHENSIBILITY OF THE DEFENDANTS' CONDUCT. The defendant James Tucker committed the ultimate defalcation of an attorney, the betrayal of the client's trust. The defendant Willie Sheffield was the moving force in the betrayal of Lillian P. Andrews. Defendant Sheffield's conduct tears at the fabric of our civil justice system. There is no question that defendant Sheffield knew that his conduct would cause harm and he proceeded to cause the lawyer to sell his client out for $15,000.00. The court determines that there was an attempted cover-up of the fraud in that the deeds were kept off record until near the very end when the fraud had been discovered. There is not significant evidence that either defendant had committed similar acts in the past.
"C. EFFORTS TO REMEDY THE WRONG. The court determines that the defendant Sheffield at no time attempted to remedy the wrong. Significantly, the plaintiffs' counsel has represented to the court that the week before the trial commenced, the plaintiffs offered to settle the entire case if the defendant would execute the necessary documents to release any claim that he *1055 may have to the plaintiff's property. The defendant refused to do so and proceeded to trial.
"D. THE PROFITABILITY TO THE DEFENDANT. This factor like many others, is difficult to ascertain in this case because the defendant Sheffield would have benefited only in the future after Mrs. Andrews's death. However, the judgment requiring the rescission of the transaction would divest the defendant Sheffield of any profit in this case.
"E. THE FINANCIAL CONDITION OF THE DEFENDANT. Of all of the Hammond-Green Oil factors, the financial position of the defendant in this case is the most important factor. Relatively few Alabama cases have considered the reduction of punitive damages against an individual defendant. Most of the reported decisions focus on the financial position of a corporate defendant. The court is of the opinion that the defendant does not have the assets to pay a $2,000,000.00 punitive damages judgment. There is testimony tending to show the defendant has undervalued his real estate holdings by approximately 50%. Moreover, the court does not believe the defendant's testimony that he lost or misplaced $500,000.00 after becoming intoxicated in Biloxi, Mississippi. The court knows that there is in excess of $400,000.00 on deposit with the clerk of the Circuit [Court] of Clarke County, Alabama. The court determines that the defendant Sheffield's assets are probably worth between $1,225,000.00 and $1,500,000.00. This factor weighs heavily in favor of a remittitur of the verdict for punitive damages.
"F. THE COST OF LITIGATION. The cost of litigation in this case does not appear to be above average and is not a significant factor in favor of a remittitur.
"G. CRIMINAL SANCTIONS. There is pending, at the present time, a criminal indictment charging the defendant Sheffield with illegal activity related to this transaction. The court has not reviewed the criminal files and does not have an opinion as to the likelihood of a successful prosecution. However, the defendant will incur additional expenses in connection with the criminal action.
"H. OTHER CIVIL ACTIONS. There are no other civil actions that could be brought against the defendant Sheffield for the wrongdoing involved in this case.
"I. COMPARATIVE CASES. The trial court is not in the position to make comparisons to other cases. However, the defendant Sheffield strongly argues that the punitive damages are all out of proportion to the compensatory damages of $10.00. The undersigned judge is of the opinion that there should be no logical connection between the amount of compensatory damages awarded and the amount of punitive damages. An act as despicable as this fraudulent conspiracy should be severely punished notwithstanding the fact that the discovery of the conspiracy was successfully thwarted, and the plaintiffs have [received], or will receive, a rescission of all of the fraudulent transactions."
C.R. at 549-54. In considering Sheffield's argument that the verdict should have been reduced by substantially more than $1,000,000, we note that Sheffield presented evidence tending to show that his estate was valued at only $720,000. The trial court, however, did not accept the value Sheffield placed on his assets and, in its order, found that Sheffield had, in fact, underestimated those assets by 50%. In addition, the trial court did not believe testimony offered by Sheffield with regard to $500,000 that had been on deposit when the judgment was entered. That testimony was as follows:
"Q. Now, at the time the judgment was entered, did you have any sums of money in accounts with your name on them other than what you've listed in this [affidavit]?
"A. I can't say what was in there at the time because I spend money every day. I can't tell you what was in there at that time because I don't recall exactly what day it was or what not that I spent it. I *1056 think there was probably a little bit more money in each one of them. I don't know.
"Q. Have you withdrawn any money from any account since the day the judgment was entered?
"A. Yeah.
"Q. Have you withdrawn any large sums of money from any account, over a hundred thousand dollars, since the judgment was entered?
"A. I can't understand the question you're asking.
"Q. The question is, have you withdrawn any large sums of money from any account since the date the judgment was entered?
"A. From any account?
"Q. Yes.
"A. Yeah.
". . . .
"Q. You withdrew a half million dollars from two CD's; is that correct?
"A. That's correct.
"Q. You withdrew it?
"A. I withdrew it, because it was in [my grandchildren's names], and the bank wouldn't let them have it.
"Q. And it's your testimony that you went to the boat
"A. I first went to Florida and bought some lottery tickets. Then I went to the boat; and when I come to, I was in my truck and didn't have nothing.
"Q. So that money is just gone?
". . . .
"Q. So since the time of the judgment and before filing this affidavit, you have blown a half million dollars at the boat and on lottery tickets?
"A. I can't say I blown it now. It could have been stolen. I couldn't tell you.
"Q. You [had] it and now it's gone?
"A. It's gone. That's correct."
R.T. at 900-03. Sheffield testified that $500,000 of his money had been "lost or stolen" while he was on a gambling junket between the day the judgment was entered and the day he filed his affidavit. The trial court did not believe Sheffield's explanation of the whereabouts of the missing funds.
The record contains evidence that Sheffield attempted to hide his assets from the court by transferring assets to family members or by suggesting that the assets had been "lost or stolen"; there is evidence that Sheffield stood to gain much from his fraudulent activities had they not been discovered; and there is evidence that Sheffield paid Tucker $15,000 to obtain title to the property for him, knowing that Ms. Andrews knew nothing of the alleged conveyance of her land. The evidence was sufficient to sustain the punitive damages award as remitted.
AFFIRMED.
HOOPER, C.J., and ALMON, SHORES, HOUSTON, KENNEDY, INGRAM, and BUTTS, JJ., concur.

On Application for Rehearing
COOK, Justice.
APPLICATION OVERRULED.
ALMON, SHORES, HOUSTON, KENNEDY, and INGRAM, JJ., concur.
HOOPER, C.J., and MADDOX and BUTTS, JJ., dissent.
MADDOX, Justice (dissenting).
I agree with Justice Butts's comments in his dissent, except that I would remit the punitive damages award to $250,000. I believe the award of $1,000,000 in punitive damages is "grossly excessive" and thus violates the defendant's right to due process. See, BMW of North America, Inc. v. Gore, 517 U.S. ___, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996).
HOOPER, C.J., concurs.
BUTTS, Justice (dissenting).
I would grant Willie Sheffield's application for rehearing to review the issue whether the trial court's remittitur of the punitive damages award against Sheffield from $2,000,000 to $1,000,000 was sufficient to have the award comport with the requirements of due process. The jury found that Sheffield's misconduct *1057 was sufficient to impose the penalty of punitive damages, and I agree that punitive damages are warranted. However, after additional study, I have concluded that a further remittitur of the punitive damages award is required. Although the exact amount of Sheffield's net worth is highly disputed, even if it is as great as the plaintiff claims, $1,220,300, then I must conclude that the $1,000,000 punitive damages award "destroys" rather than "stings." See Green Oil Co. v. Hornsby, 539 So.2d 218, 222 (Ala.1989). I believe a punitive damages award of $350,000 would accomplish "society's goals of punishment and deterrence," id.; thus, I would further remit the award to that amount.