711 So.2d 901 (1997)
HILLCREST CENTER, INC., et al.
v.
Robert E. RONE and Mariella C. Rone.
1940535.
Supreme Court of Alabama.
August 1, 1997.
Opinion Modified on Denial of Rehearing November 14, 1997.
Rehearing Denied with Statement November 14, 1997.
*902 Forrest S. Latta and W. Pemble DeLashmet of Pierce, Carr, Alford, Ledyard & Latta, P.C., Mobile, for appellants (on original submission).
Michael A. Worel of Cunningham, Bounds, Yance, Crowder & Brown, Mobile, for appellant Hillcrest Center III, Ltd. (on original submission).
David P. Broome, Mobile, for appellees.
Forrest S. Latta and J. Robert Turnipseed of Pierce, Ledyard, Latta & Wadsden, P.C., Mobile, for appellants (on application for rehearing).
COOK, Justice.
The defendants, Hillcrest Center, Inc.; Hillcrest Center III, Ltd.; and Margaret G. Seibert, appeal from a judgment in favor of the plaintiffs, Robert E. Rone and his wife, Mariella C. Rone. We affirm conditionally.
Hillcrest Center, Inc., is an Alabama corporation, and it is the sole general partner of Hillcrest Center III, Ltd., an Alabama limited partnership. Margaret Seibert is the president of Hillcrest Center, Inc., and is an officer of Hillcrest Center III, Ltd. Hillcrest Center, Inc., manages the commercial building in issue here (Hillcrest Office Park), which is owned by Hillcrest Center III, Ltd.
In April 1993, the Rones sued, alleging that Seibert, by intentional or reckless misrepresentations, had fraudulently induced the Rones to lease space in a commercial building owned by Hillcrest Center III, Ltd. The Rones sought money damages and rescission of the lease contract. The defendants denied the allegations of the complaint and asserted the affirmative defense of estoppel.
In November 1993, the defendants filed a motion asking that the Rones be required to make an election of remedies, on the ground that the claim alleging fraud in the inducement was inconsistent with the claim seeking rescission of the lease. In response to that motion, the trial court held:
"[I]f [the Rones] can prove to the reasonable satisfaction of the finder of fact that they were fraudulently induced to enter into the lease in question and further that they have suffered compensatory damages as a result of such fraudulent inducement, the jury will be instructed that compensatory damages, if any, will only be recoverable for the period of time ending with the date of trial. This order has no effect on [the Rones'] prayer for punitive damages as set out in their complaint."
During trial, the defendants moved to strike the counts of the complaint seeking damages for fraud, claiming that the Rones *903 had elected the remedy of rescission of the lease contract and, having done so, could not also recover compensatory and punitive damages for the fraud claim, which the defendants alleged was inconsistent. The trial court denied the motion. The trial court also denied the defendants' motion to exclude evidence relating to the claims for punitive damages and damages to compensate for lost profits.
The trial court instructed the jury with regard to fraud resulting from intentional or reckless misrepresentations; promissory fraud; and compensatory and punitive damages. The trial court denied the defendants' requested jury instruction on the affirmative defense of estoppel. The issue whether the lease contract should be rescinded was also submitted to the jury.
The jury's general verdict read, in pertinent part, as follows:
"We, the jury, find for the plaintiffs against the defendants.... And we award the following relief: The lease between the plaintiffs and Hillcrest Center, Inc., shall be rescinded.... Furthermore, compensatory damages are assessed in favor of the plaintiffs in the sum of $47,000 against the defendants.... Furthermore, punitive damages are assessed in favor of the plaintiffs in the sum of $200,000 against the defendants."
The trial court entered a final judgment on the jury's verdict, and the Rones vacated Hillcrest Office Park. After a hearing on the parties' post-trial motions, the trial court, pursuant to Hammond v. City of Gadsden, 493 So.2d 1374 (Ala.1986), and Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala.1989), granted the defendants' motion for a remittitur with regard to the punitive damages award and reduced the punitive damages award to $130,000.

I.
The defendants contend that the trial court erred in submitting the Rones' fraud claims to the jury. However, say the defendants, even if the trial court had been correct in charging the jury on fraud, the evidence did not support the claim alleging ordinary fraud and the jury was entitled to consider only the claim of promissory fraud. We disagree.
Mariella Rone met Seibert in 1990 when Seibert came into Mrs. Rone's small manicure shop in Mobile. In the fall of 1991, Mrs. Rone told Seibert that she and her husband were looking for space where they could open a full-service beauty salon. The Rones had attempted to find space for their proposed salon business but had been unsuccessful because of their parking requirements. Seibert told Rone about the plans for the Hillcrest Office Park and told Mrs. Rone that she should put the new business there.
The Rones contended that, during numerous meetings regarding the lease contract, they made it clear to Seibert that their business required a large number of parking spaces for employees and clients and that sufficient parking was a prerequisite to their leasing space at Hillcrest Office Park. Mrs. Rone testified that she told Seibert that more than one commercial building manager had refused to lease space to the Rones for the salon because the Rones' parking needs were so great. Robert Rone testified that he gave Seibert a list indicating the number of employees and clients that could be at the salon at any given time, along with an estimate that the salon would need a total of approximately 30 spaces. According to the Rones, Seibert consistently assured them that parking would be no problem and that there would be a "huge" parking area.
Robert Rone testified that he met with Seibert on October 8, 1991, before signing the lease. He stated that he pointed out to Seibert paragraph 30 of the lease agreement, which assigned only three parking spaces to the Rones' business, and that he reminded Seibert that their business would require many more parking spaces than three. Rone also told Seibert that he was quitting his job to manage the beauty salon and could not afford to have the business fail. According to Mr. Rone, each time he expressed to Seibert his concerns about the parking, she told him not to worry, that there would be plenty of parking, and that she had an option to purchase an adjacent lot where she intended to build a small building and a large parking lot.
*904 The Rones testified that Seibert's representations regarding the adequacy of parking were a primary inducement to them to put their new business in Hillcrest Office Park. They also testified that, in reliance on Seibert's representations, they executed a five-year commercial lease for the space at Hillcrest Office Park.
As the lot was cleared for construction of Hillcrest Office Park to begin, the Rones realized that the parking at the new building would be inadequate to accommodate their needs. According to the Rones, Seibert continued to assure them that additional parking would be available on the adjacent lot. At trial, Seibert maintained that she did not recall, from these early meetings with the Rones, any specific conversations about parking.
The Rones moved their business into Hillcrest Office Park in the spring of 1992. According to the Rones, they had inadequate parking space and experienced problems because of the inadequate parking, including an inability to attract employees and clients. Mrs. Rone testified that the building held four businesses, that the parking lot contained only 12 spaces, and that the Rones' business alone was designed to employ 13 people (a fact, say the Rones, that they had communicated to Seibert). The Rones testified that, because of the inadequate parking, they were able to have only two hairdressers and Mrs. Rone working at the salon at any given time. As a result, they testified, they were able to utilize only one-half of the leased space, although they had purchased and installed equipment and fixtures for the entire leased premises.
On December 29, 1992, Seibert met with the Rones and told them that she would not be purchasing the adjacent property and that no additional parking would be available. Seibert testified that she had always planned on putting a building and parking facilities on the adjacent lot, but that she had never planned on using it exclusively as a parking area. Therefore, Seibert said, when she could not get a commitment from a tenant for the proposed building on the adjacent lot she withdrew her offer to purchase the property.
Another prospective tenant of Hillcrest Office Park testified that when he questioned Seibert about the apparent scarcity of parking, she assured him that parking would be no problem because there would be "an arrangement" with the owner of the adjacent property to handle Hillcrest Office Park's overflow parking. This conversation took place in February 1993after the December 29, 1992, meeting between the Rones and Seibert during which Seibert admitted that the adjacent property was no longer a part of the plan for Hillcrest Office Park.
The final witness at trial was Don Williams, the engineer on the Hillcrest Office Park construction and on other construction done for Seibert. Williams testified that when working on a project such as Hillcrest Office Park, Seibert "always wants the maximum size building and the minimum parking spaces" allowed by law.
In charging the jury, the trial court correctly set out the essential elements of what the court called "factual fraud," as well as the additional elements required for the recovery of punitive damages:
"These four elements, if proved to your reasonable satisfaction, would constitute a valid claim for innocent misrepresentation and would entitle the plaintiffs to recover compensatory damages only.
"Three additional elements are necessary for the plaintiffs to recover punitive damages. They are, first of all, either that a defendant made the misrepresentation intentionally in the sense that the defendant knew of the falsity of the misrepresented fact or knew of the existence of the concealed fact or recklessly as to be equally culpable as an intentional misrepresentation...."
(Emphasis added.)
This Court has written:
"In ordinary cases of alleged fraud, the plaintiff must prove that the defendant made a false representation of a material fact and that the plaintiff relied upon the false representation to his detriment. In many cases, a defendant's recklessness in making a false representation is sufficient to support a fraud claim; the actual intention *905 to defraud is often not needed. However, the law places a heavier burden in those fraud actions where one attempts to prove fraud based on a misrepresentation relating to an event to occur in the future. In those `promissory fraud' actions, the plaintiff must prove that, at the time the representation was made, the defendant had an intention not to perform the act promised and had an intention to deceive the plaintiff.
"The question of the defendant's intention in making the alleged representation is ordinarily a question of fact for the jury. However, the plaintiff must show more than that the defendant failed to fulfill the promised act; otherwise, as has been often noted by this Court, a typical breach of contract claim would invariably contain a fraud claim as well."
National Security Insurance Co. v. Donaldson, 664 So.2d 871, 876 (Ala.1995) (citations omitted).
We hold that there was substantial evidence from which the jury could reasonably infer that Seibert's continued promises of parking adequate to meet the demands of the Rones' business were, at the very least, reckless misrepresentations. Indeed, the factfinder could reasonably infer from the evidence that Seibert knew or should have known that the planned parking at Hillcrest Office Park would be entirely inadequate for the Rones' needs.[1]
Although Seibert made efforts to obtain parking space on the adjacent lot, her assertions to the Rones that the adjacent lot would be available for parking constitute a basis for a finding of a reckless misrepresentation because, at the time the statements were made, she was still negotiating for the purchase of that lot and in fact there was no guarantee that she would be able to purchase it, or a finding that she had not intended to purchase the lot if she would not be able to place a building on it.
Seibert's persuading the Rones to enter into the lease agreement was premised on the Rones' believing that Seibert had the present ability to provide the number of agreed-upon parking spaces within a certain period of time. The misrepresentation of the existing material fact occurred when Seibert told the Rones, among other things, that she had the option to purchase the adjacent lot, and that there would be ample parking in a huge parking lot, thereby conveying to the Rones the impression that Seibert had the present ability to provide the required number of parking spaces.
"[W]hen representations are made recklessly and heedlessly without any regard to their consequences, they will supply the necessary intent to support a fraud action." Winn-Dixie Montgomery, Inc. v. Henderson, 395 So.2d 475, 476 (Ala.1981). The evidence supports the conclusion that Seibert recklessly misrepresented an existing material fact to the Rones and that, in justifiable reliance[2] on Seibert's misrepresentation, the Rones suffered damage. There was no error in submitting to the jury the Rones' claim alleging ordinary fraud.
With regard to promissory fraud, this Court has held:

*906 "[A] reckless misrepresentation cannot constitute fraud where the alleged misrepresentation relates to some future event. Where the misrepresentation relates to some future event, it must be shown that the person making the representation intended not to do the act promised at the time the misrepresentation was made."
Russellville Production Credit Ass'n v. Frost, 484 So.2d 1084, 1087 (Ala.1986).
"Ordinarily, intent is a matter peculiarly within the province of the trier of facts." Purcell Co. v. Spriggs Enterprises, Inc., 431 So.2d 515, 519 (Ala.1983). Taking the testimony of all the witnesses as a whole, we conclude that the evidence was sufficient for the jury to infer that Seibert intended, from the beginning, to induce the Rones to execute the lease contract, yet never intended to purchase the adjacent lot to provide the additional parking unless she was able to secure a tenant for the proposed building to be built on the adjacent lot (a "contingency" Seibert never communicated to the Rones), despite her continued assurances to the Rones that there would be "plenty of parking." The evidence was sufficient for the jury to infer that Seibert's conduct toward the Rones exhibited the intent required for a finding of promissory fraud.[3]

II.
The defendants next argue that they are entitled to a new trial because, they say, the court allowed the Rones incompatible forms of relief: damages for fraud and rescission of the lease contract. In support of this argument, the defendants quote from Day v. Broyles, 222 Ala. 508, 509, 133 So. 269 (1931):
"[W]hen one is induced to enter into ... a contract by fraud, he has an election of remedies, either (1) to rescind the contract and sue for his money back, in which event he must give up possession of the property and restore all the benefits he received under it, or (2) affirm the contract, and sue for damages for the deceit, when he may retain the property, and its other benefits."
In Sheffield v. Andrews, 679 So.2d 1052 (Ala.), cert. denied, ___ U.S. ___, 117 S.Ct. 610, 136 L.Ed.2d 535 (1996), this Court was faced with a similar issue. In Sheffield, the plaintiff was allowed to "rescind" a contract that had been executed as a result of the defendant's fraud and was awarded punitive damages for the fraud. In answering the defendant's contention that these remedies were inconsistent and mutually exclusive, we held:
"In Mid-State Homes, Inc. v. Johnson, 294 Ala. 59, 66, 311 So.2d 312, 318 (1975), this Court held that `where one rescinds a contract induced by fraud and recovers even nominal damages, then in an appropriate case he may also recover punitive damages.' The [Mid-State] Court, quoting with approval Ward v. Taggart, 51 Cal.2d 736, 336 P.2d 534 (1959), stated:
"`"Courts award exemplary damages to discourage oppression, fraud, or malice by punishing the wrongdoer.... Such damages are appropriate in cases ... where restitution would have little or no deterrent effect, for wrongdoers would run no risk of liability to their victims beyond that of returning what they wrongfully obtained...."
"`We agree with this reasoning. Punitive damages are for punishment and prevention. To allow them when a contract is affirmed, and not when there is a rescission, is illogical when the purposes of punitive damages are considered. The punitive and deterrent force of the law should be present in both types of cases since both arise from perpetration of fraud.'"
"Mid-State Homes, Inc. v. Johnson, 294 Ala. at 66, 311 So.2d at 318." *907 Sheffield v. Andrews, 679 So.2d at 1053 (emphasis added).
The Rones contend that this case falls squarely within the holdings of Sheffield and Mid-State Homes, and that forcing them to elect between remedies would, in effect, allow the defendants to perpetrate a fraud and run no risk of liability beyond placing themselves in the position they were in when Seibert began her negotiations with the Rones. We agree. The jury found that the defendants were guilty of fraud in the inducement; therefore, the remedy of allowing rescission of a contract executed as the result of fraudulent misrepresentations is not inconsistent with a monetary award for the damage resulting from the fraud.

III.
The defendants next argue that the trial court erred in not charging the jury on the affirmative defense of estoppela defense raised by the defendants in their answer and, according to the defendants, covered by their written requested jury charge on estoppel. We disagree, for several reasons.
The defendants' requested jury charge is incomplete in that it did not set out the elements that must be proved to support a claim of estoppel. See Talladega City Board of Education v. Yancy, 682 So.2d 33 (Ala.1996) (quoting Mazer v. Jackson Insurance Agency, 340 So.2d 770 (Ala.1976)). Indeed, the requested charge did no more than recite the defendants' conclusions as to the Rones' conduct and state of mind and the defendants' allegations that, as a result of what the defendants perceived to be the Rones' conduct and state of mind, the Rones were estopped from suing these defendants.
Further, we note a further portion of Mazer that was quoted with approval in Yancy:
"The purpose of [the doctrine of] equitable estoppel ... is to promote equity and justice in an individual case by preventing a party from asserting rights under a general technical rule of law when his own conduct renders the assertion of such rights contrary to equity and good conscience. First National Bank of Opp v. Boles, 231 Ala. 473, 479, 165 So. 586, 592 (1936)."
Mazer v. Jackson Insurance Agency, 340 So.2d at 772. No evidence in the record would support an inference that the Rones' conduct "render[ed] the assertion of [their] rights contrary to equity and good conscience." Indeed, the evidence tended to show that the Rones remained at Hillcrest Office Park and continued to make improvements to their leased space in good-faith reliance on the assertions of Seibert that the problem of inadequate parking would be remedied.
We also note that the defendants' requested charge on estoppel would not advise the jury that it could find that the Rones were estopped from asserting their claims against these defendants only if it first found that the Rones had certain knowledge that Seibert had never intended to supply additional parking, despite assurances otherwise. This prerequisite was not a part of the defendants' requested charge; thus, the charge was defective in this additional aspect.
Finally, we note that the requested charge would advise the jury that the Rones were estopped from bringing their claims because they occupied the leased premises in April 1992 and "did not bring this action until a full year later." The statutory limitations period for a fraud action is two years (Ala. Code 1975, § 6-2-38); therefore, this portion of the requested charge is misleading and a misstatement of Alabama law.
The defendants did not request a curative amendment so that the requested charge would adequately state the law on estoppel as applied under the circumstances of this case. The trial court correctly denied the requested charge regarding estoppel.

IV.
Finally, the defendants argue that if this Court affirms the imposition of liability, then it should further reduce the damages award.
The defendants first contend that the Rones' evidence regarding lost profits was inadmissible and that the jury based its verdict on that evidence. According to the defendants, Alabama law requires that evidence *908 of lost profits with regard to a new, unestablished business be established by expert testimony only. We disagree.
In Kirkland & Co. of Anniston, P.C. v. A & M Food Service, Inc., 579 So.2d 1278 (Ala.1991), this Court noted that claims of lost profits were often supported by expert testimony, but stated that the standard to be applied in regard to claims for lost profits is one of "reasonable certainty":
"The `reasonable certainty' standard provides that `recovery will ensue despite the fact damages cannot be calculated with mathematical certainty or without difficulty where they are clearly proximately caused by the wrong.' Morgan [v. South Central Bell Telephone Co., 466 So.2d 107, 116 (Ala.1985)]."
579 So.2d at 1287-88. See, also, Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544 (1931).
In Mason & Dixon Lines, Inc. v. Byrd, 601 So.2d 68 (Ala.1992), we reaffirmed the "reasonable certainty" standard by which to test a basis for estimating alleged lost profits. In Mason & Dixon, Byrd sued Mason and Dixon Lines, alleging fraud and breach of contract, based on a claim that Mason and Dixon had induced Byrd to become its transportation agent and then had terminated his services.
With regard to Byrd's proof of his damages claima claim for lost profitsthe Mason & Dixon Court quoted with approval from Paris v. Buckner Feed Mill, Inc., 279 Ala. 148, 149-50, 182 So.2d 880, 881 (1966):
"`[T]he loss of profits must be the natural and proximate, or direct result of the breach complained of and they must also be capable of ascertainment with reasonable, or sufficient, certainty, or there must be some basis on which a reasonable estimate of the amount of the profit can be made; absolute certainty is not called for or required.'"
601 So.2d at 70. The Mason & Dixon Court went on to state, "`[T]he rule dictates that recovery will ensue despite the fact damages cannot be calculated with mathematical certainty.' " 601 So.2d at 70, quoting Morgan v. South Central Bell Telephone Co., 466 So.2d 107, 116 (Ala.1985), and it allowed Byrd to compare his earnings with his previous employer with his potential earnings at Mason and Dixon, which, this Court held, "constituted a horizontal comparison of businesses and provided a basis for the jury to estimate with reasonable certainty the profits Byrd lost." 601 So.2d at 71.
Robert Rone, who kept the financial books for the Rones' business, was allowed to testify concerning the lost profits the Rones alleged had proximately resulted from Seibert's misrepresentations. Plaintiffs' Exhibits 11 and 12, prepared by Robert Rone and containing projections for income and expenses for the Rones' business for the first two years of operation, were admitted into evidence. These exhibits, however, were admitted only with the trial court's explicit direction to the jury that the projections were offered to "show that the parties may have anticipated or contemplated such income or such expenses," and that the jurors should give these exhibits "such weight and credibility as [they] assign to it in [their] discretion." Based on the trial court's limiting instructions setting out the predicate upon which the jury was directed to view these two exhibits, we find no error in the admission of Plaintiffs' Exhibits 11 and 12.
Further, in its "order and revised judgment" entered following the hearing on post-trial motions, the trial court reaffirmed the correctness of the jury's award of compensatory damages. The trial court stated that the Rones had suffered "significant" harm and that there was sufficient evidence to support the jury's award of $47,000 in compensatory damages. We find no error in the jury's awarding compensatory damages or in its computation of those damages, and we find no error in the trial court's order upholding the compensatory damages award. See Hollis v. Wyrosdick, 508 So.2d 704 (Ala. 1987).
The trial court reduced the jury's punitive award of $200,000 by $70,000. We find no abuse of discretion in the trial court's order reducing the award of punitive damages to $130,000.
*909 Recent decisions of this Court and of the United States Supreme Court have explained and refined appellate review of punitive damages awards in Alabama. See, for example, BMW of North America, Inc. v. Gore, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996). However, these decisions leave unaltered the presumption of correctness that attends a jury verdict awarding punitive damages and leave unaltered the defendant's burden for overcoming that presumption, the burden of proving the verdict was not correct. Here, the presumption of correctness is strengthened by the trial court's denial of the defendants' post-judgment motions, by its conducting a post-judgment hearing pursuant to Hammond v. City of Gadsden, 493 So.2d 1374 (Ala.1986), and Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala.1989), and by its reducing the punitive damages award by $70,000.
Therefore, in light of the presumption attending the judgment appealed from, in order to determine whether these defendants are correct in arguing that the punitive damages award is excessive or otherwise improper this Court must conduct a "meaningful" judicial review pursuant to the principles discussed in BMW v. Gore, supra, and Pacific Mutual Life Ins. Co. v. Haslip, 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991), and determine whether the trial court correctly applied the "Green Oil factors" during its post-judgment Hammond hearing.
The trial court's "order and revised judgment" reveals that the court thoroughly reassessed the evidence and the relative positions of the parties and understood the purposes and practical results of imposing punitive damages. The court's reassessment and understanding were accomplished as a result of the application of the principles enumerated in Green Oil.
In this review of a contested punitive damages award, we must consider the "guideposts" set out by the United States Supreme Court in BMW v. Gore, supra. Thus, we look carefully at 1) the degree of reprehensibility of the defendants' conduct; 2) the ratio of the punitive damages award to the compensatory damages award; and 3) a comparison of the punitive damages award with civil or criminal penalties that could be imposed for comparable conduct.
The reprehensibility of the defendants' conduct is of a degree that supports the jury's punitive damages award. In the preceding portions of this opinion we held that there was substantial evidence from which the jury could properly infer that Seibert was guilty of fraud of either the ordinary variety or the promissory variety. In his "order and revised judgment," the trial judge characterized the conduct of Seibert, including the execution of a "sham mortgage" on Seibert's home, as "chicanery in concealing and minimizing ... assets."
There are no comparable civil or criminal remedies against which we may gauge the punitive damages awarded here. However, with regard to the third BMW v. Gore "guidepost"the ratio of the punitive damages to the compensatory damageswe are reminded of this Court's language in Green Oil, supra:
"Because the purpose of punitive damages is not to compensate the plaintiff but to punish the wrongdoer and to deter the wrongdoer and others from committing similar wrongs in the future, the proper amount of punitive damages rests largely within the jury's discretion. However, although punitive damages need bear no particular relationship to actual damages, they, nonetheless must not exceed an amount that will accomplish society's goals of punishment and deterrence."
539 So.2d at 222. See, also, Wilson v. Dukona Corp., N.V., 547 So.2d 70 (Ala.1989).
According to the testimony presented in support of the post-judgment motions and the findings of the trial court following the hearing on those motions, the punitive damages award, as reduced by the trial court, is approximately 60% of the net worth of Mrs. Seibert and the corporate defendants. The ratio of the punitive damages award, as reduced, to the compensatory damages award is approximately 2.8:1. While not reaching an amount that would destroy the defendants, the punitive damages award does, under these circumstances, exceed what is necessary to "punish."
*910 We hold, therefore, as follows: The judgment is affirmed as to the imposition of liability, both for compensatory damages and for punitive damages; and the $47,000 award of compensatory damages is affirmed. However, the award of punitive damages must be reduced to $94,000.[4] If the plaintiffs do not, within 28 days of the date of this opinion, file with the clerk of this Court a remittitur of $36,000, then the defendants shall be granted a new trial.
AFFIRMED CONDITIONALLY.
ALMON, SHORES, HOUSTON, and KENNEDY, JJ., concur.
BUTTS, J., concurs in part and dissents in part.
HOOPER, C.J., and MADDOX and SEE, JJ., dissent.
BUTTS, Justice (concurring in part and dissenting in part [as to opinion of August 1, 1997]).
I concur except as to the amount of the remittitur of punitive damages ordered. The record shows that Seibert has $150,000 in personal assets, plus $65,000 in equity in the Hillcrest commercial property, for a total net worth of $215,000. After the remittitur, the remaining punitive damages award of $94,000 amounts to approximately 44% of Seibert's net worth. As this Court pointed out in BMW of North America, Inc. v. Gore, 701 So.2d 507(Ala.1997) (on remand from the United States Supreme Court), a punitive damages award that exceeds 10% of the defendant's net worth might be considered to have crossed the line between punishment and destruction. I believe that a punitive damages award of $94,000 crosses that line here. I would order a remittitur of $108,000, resulting in a punitive damages award of $22,000, approximately 10% of Seibert's net worth.
HOOPER, Chief Justice (dissenting [as to opinion of August 1, 1997]).
I must respectfully dissent. Certainly, any customer-driven enterprise must have easy parking access to be successful. I believe these plaintiffs deserved a judgment that would release them from their contract or, in the alternative, one that would place them firmly in the position they would have occupied had the contract been correctly performed. I am glad this Court reduced the punitive damages award; however, the majority both rescinds the contract and awards compensatory and punitive damages to the plaintiffs. The punitive award, even when reduced, will almost surely destroy the defendants. This award, allowing both equitable and legal remedies, severely punishes Seibert and unjustly rewards the Rones.
The general rule that should be applied in this case is the rule stated in Glass v. Cook, 257 Ala. 141, 144, 57 So.2d 505, 507 (1952), "that one defrauded has to elect either to affirm the contract and sue for damages for the deceit or disaffirm and sue for his money back but he may not do both." (Emphasis added.) The appellees claim that the extraordinary rule from Mid-State Homes, Inc. v. Johnson, 294 Ala. 59, 311 So.2d 312 (1975), and not the general rule, should apply. I find their reliance on this exception to be misplaced.
In Mid-State Homes, the plaintiff made a down payment on property to which he was guaranteed immediate possession but (a) as to which he was never put into possession, (b) which he was never allowed to use or otherwise receive any benefit from, and (c) for which he never made any periodic payments. In Mid-State Homes, quoting from Ward v. Taggart, 51 Cal.2d 736, 743, 336 P.2d 534, 538 (1959), this Court wrote:
"`Courts award exemplary damages to discourage oppression, fraud, or malice by punishing the wrongdoer.... Such damages are appropriate in cases like the present one, where restitution would have little or no deterrent effect, for wrongdoers would run no risk of liability to their victims beyond that of returning what they wrongfully obtained....'"
294 Ala. at 66, 311 So.2d at 318.
If the plaintiff's remedy in Mid-State Homes had been limited to rescission, then the defendant, who had never given up possession *911 of the property nor given the benefit of the land to the plaintiff, would have lost nothing. In that case, exemplary damages were appropriate.
In the instant case, however, the defendants surrendered possession of the building for approximately one year. During that time, the Rones had the benefit of running a business for profit on the premises. After successfully arguing their case, the Rones were awarded compensatory damages of $47,000, an amount that covers the rent they paid, and they were awarded $130,000 in punitive damages.
I believe that if the trial court was satisfied that the elements of ordinary fraud or of promissory fraud were present, then the contract should have been rescinded and the defendants should have been forced to pay costs and compensatory damages incurred between the time of contracting and the rescission of the contract. If the trial court had ordered this remedy, then the defendants still would have been forced to pay compensatory damages, the Rones would have profited from their year in business using the lease, and Seibert would have had to endure the burden of finding new tenants after the rescission. Allowing the Rones to rescind the contract and receive compensatory damages would have been punishment enough. Therefore, this case is much more similar to cases that follow the general rule of Glass than it is to those cases that follow the extraordinary rule from Mid-State Homes.[5]
Another major concern I have with the majority's opinion is with the magnitude of the punitive damages award. Considering the evidence in the trial court's Hammond Green Oil order in the light most favorable to the plaintiffs, I think this punitive award is manifestly unjust and unfair and is unconstitutionally excessive. According to the trial judge's finding, the defendants' net worth is $215,000. The punitive award, even after the reduction to $94,000, will be approximately 44% of their net worth. Such an excessive verdict will certainly destroy the defendants financially. Have the courts of Alabama abandoned the notion that punitive damages should serve to punish the defendants and adopted the idea that punitive damages must destroy in order to be effective? Judging from this dispute over the number of parking spaces at a beauty salon, it appears that we have.
For these reasons, I must dissent.
MADDOX and SEE, JJ., concur.

On Application For Rehearing
COOK, Justice.
There being no reason to disturb the original (August 1, 1997) holding, the application for rehearing is overruled. The extension of the discussion in this case, on application for rehearing, shall not be construed as a substantial modification of the original opinion for purposes of filing a second application for rehearing. See Ala. R.App. P. 40.
APPLICATION OVERRULED; OPINION OF AUGUST 1, 1997, MODIFIED.
ALMON, SHORES, HOUSTON, KENNEDY, and BUTTS, JJ., concur.
HOOPER, C.J., and MADDOX and SEE, JJ., dissent.
NOTES
[1] Indeed, the trial court, in its order following the hearing on the defendants' motion for a remittitur of damages, referred to the testimony of Seibert's engineer on the Hillcrest Office Park project:

"Seibert advised [the Rones] that there would be ample parking available in a huge parking lot which would accompany the construction of the building and which would meet [the Rones'] specific needs. Before Seibert made these representations, she had advised her project engineer to design the largest building possible with the smallest parking lot allowed by the building codes and had obtained drawings from the engineer which showed that parking for all prospective tenants of the entire building (which would be occupied by several tenants other than [the Rones]) would not have the number of spaces specified by [the Rones] alone."
(Emphasis added.)
[2] In Foremost Insurance Co. v. Parham, 693 So.2d 409 (Ala. 1997), this Court overruled Hickox v. Stover, 551 So.2d 259 (Ala.1989), and readopted the "reasonable reliance" standard of review. However, because this return to the reasonable reliance standard represented a fundamental change in the law of fraud, the Court made that new standard applicable in all fraud cases filed after the date Foremost was decided, i.e., March 14, 1997.
[3] In this case, there is no problem resulting from the fact that multiple claims were submitted to the jury and the jury returned a general verdict. At the close of the Rones' case, the defendants moved for a directed verdict as to both ordinary fraud and promissory fraud. The court denied the motion, and the jury returned a general verdict in favor of the Rones. Because there was sufficient evidence to require the trial court to submit to the jury the claim alleging ordinary fraud and the claim alleging promissory fraud, it is apparent that the verdict was returned on a valid count. See Cummins Engine Co. v. Invictus Motor Freight, Inc., 641 So.2d 761 (Ala.1994); Aspinwall v. Gowens, 405 So.2d 134 (Ala.1981).
[4] This reduction results in a 2:1 ratio of punitive damages to compensatory damages.
[5] Since 1975, this Court has only one time followed the exceptional rule regarding rescission and punitive damages in a fraud case based on Mid-State Homes. See Sheffield v. Andrews, 679 So.2d 1052 (Ala. 1996). I concurred in Justice Cook's opinion in Sheffield, based on the same principles that compel me to dissent in the present case. In Sheffield, the Court reasoned that punitive damages must be permitted, or else the defendant would be allowed to perpetrate fraud and face no risk of liability beyond that of returning that which was wrongfully obtained. 679 So.2d at 1053. The defendants face liability even if the plaintiffs are awarded no punitive damages. Ordering rescission (and not punitive damages) would give the Rones the benefit of their year in business on the premises while burdening Seibert in her release of the property for the year, her payment of compensatory damages, and her effort to find new tenants. Evidence at trial tended to indicate that the compensatory award, without the punitive damages award, would be sufficient to destroy the defendants financially. Even in Sheffield, I considered the punitive damages originally awarded to be unreasonably high. See Justice Maddox's dissent in Sheffield from the order overruling the application for rehearing, 679 So.2d at 1059.